E-FILED
Wednesday, 31 January, 2018  04:58:57 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| CINCINNATI INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 3:12-cv-3289 |
| v. | ) | |
| | ) | |
| H.D. SMITH WHOLESALE DRUG COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**CINCINNATI INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

NOW COMES Plaintiff Cincinnati Insurance Company ("Cincinnati"), by its attorneys, Litchfield Cavo LLP, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7.1(D) of the Local Rules of the Central District of Illinois provides its Memorandum of Law in Support of its Motion for Summary Judgment against H. D. Smith Wholesale Drug Company, n/k/a H. D. Smith, L.L.C., ("H. D. Smith"). In support thereof, Cincinnati states as follows:

## I.    INTRODUCTION

Through this litigation, Cincinnati seeks a declaration regarding insurance coverage sought by H.D. Smith in connection with an underlying lawsuit brought against it by the State of West Virginia ex rel. Darrell V. McGraw, Attorney General (the "Underlying Lawsuit"). The Underlying Lawsuit, styled as *State of West Virginia v. Amerisourcebergen Drug Corporation et al*., Civil Action No. 12-C-141 was originally filed in June 2012 in the Circuit Court of Boone County, West Virginia.

The Underlying Lawsuit concerned an alleged "epidemic" of prescription drug abuse by West Virginia citizens. H.D. Smith is alleged to have been on notice of the growing epidemic from the abuse of those prescription drugs which it allegedly supplied and of the quantities and

frequency with which those drugs were distributed to entities in West Virginia.  The State of West Virginia[1] claims that H.D. Smith has inserted itself as an integral part of the "pill mill" process wherein medical providers, pharmacies and distributors of controlled substances prescribe, dispense and distribute prescription medicines for illegitimate medical purposes. West Virginia alleges that H.D. Smith acted negligently, recklessly, and at times illegally all in contravention of West Virginia law which governs controlled substances, consumer protection laws, and antitrust laws.

The claims stated in the Underlying Lawsuit are based on H.D. Smith's persistent and intentional business practices. Further, the State of West Virginia alleges that the prescription drug epidemic is the natural result of H.D. Smith's practices and/or because, despite knowledge of the epidemic, H.D. Smith turned a blind eye to the problem and continued business as usual. Damages arising from such allegations cannot be said to have been accidental. In addition, as stated many times over by the State of West Virginia in its complaints and other legal filings, it seeks economic and injunctive relief on behalf of the State itself.

The allegations stated in the Underlying Lawsuit presented questions regarding whether insurance coverage was owed under the insurance policies it issued to H.D. Smith.  Therefore, Cincinnati promptly filed this action seeking a declaration regarding its potential defense and indemnity obligations to H.D. Smith in connection with that matter.  The parties presented the duty to defend issue to this Court through summary judgment briefing in 2014.  Following H.D. Smith's appeal to the 7th Circuit Court of Appeals, Cincinnati's duty to defend H.D. Smith was established through the Court of Appeals decision of July 19, 2016.  Following remand, this

---

[1] In the course of the litigation of the Underlying Lawsuit, two State of West Virginia agencies were added as additional plaintiffs: the West Virginia Department of Military Affairs and Public Safety; and the West Virginia Department of Health & Human Resources.  The three plaintiffs are referenced collectively as the "State of West Virginia".

Court entered an Order on August 31, 2016 granting partial summary judgment and ruling that CIC had a duty to defend H. D. Smith on the grounds that the Underlying Lawsuit stated potentially covered claims.

Despite its denial of any liability, and despite the fact that it was aware that Cincinnati was required to provide for its defense in relation to the Underlying Lawsuit, H.D. Smith determined in 2016 that it would settle the Underlying Lawsuit.  H.D. Smith did so without Cincinnati's involvement and then, after the deal was reached, demanded that Cincinnati provide coverage for the full amount H.D. Smith had agreed to pay.  Based on the allegations stated in the Underlying Lawsuit and also on the lack of information provided to Cincinnati demonstrating that the settlement was based on damages that might be covered under the pertinent insurance policies, Cincinnati denied the demand that it pay the entirety of H.D. Smith's settlement of the Underlying Lawsuit.  Cincinnati offered to discuss contribution toward the settlement if H.D. Smith would provide support for its position that the settlement was for covered damages.  In response, H.D. Smith filed an Amended Counterclaim seeking a declaration regarding Cincinnati's coverage obligations, damages based on Cincinnati's alleged breach of contract, and damages under 215 ILCS 5/155 based on Cincinnati's failure to pay for its settlement of the Underlying Lawsuit.

Cincinnati denies that it owes coverage to H.D. Smith for its settlement of the Underlying Lawsuit, denies that it breached any obligations to H.D. Smith in connection with the Underlying Lawsuit, and denies that it acted unreasonably at any time or that it is liable in any fashion for damages under 215 ILCS 5/155.  For the reasons stated herein, this Court should find that Cincinnati is entitled to summary judgment with respect to the lack of coverage for H.D. Smith's

settlement and with respect to all causes of action stated by H.D. Smith in its Amended Counterclaim, including its claim for damages under 215 ILCS 5/155.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   Undisputed Material Facts Regarding the Underlying Lawsuit

1. The Second Amended Complaint was filed in the Underlying Lawsuit in January 2015. (*See* attached Exhibit A, a copy of the Second Amended Complaint with redactions as required by the Circuit Court of Boone County, West Virginia in its May 6, 2016 Order unsealing the complaint).

2. In the Second Amended Complaint, the State of West Virginia alleged that there were "literally thousands of wrongful acts" which would be litigated in that case and, as an example, cited to H.D. Smith's "12,400 transactions" to a pill mill pharmacy in Mingo County, West Virginia. (See Ex. A at pp. 2-3).

3. In contrast to the prior complaints, the Second Amended Complaint included specific allegations regarding H.D. Smith's distribution of controlled substances to the State of West Virginia. (See Ex. A at pp. 31-37).

4. It was alleged therein that the sheer volume of tablets or pills shipped by H.D. Smith demonstrated the suspicious nature of the distributions and represented a gross violation of H.D. Smith's legal duty to not distribute controlled substances for non-legitimate purposes. (See Ex. A at pp. 33-37).

5. The Second Amended Complaint stated the following six causes of action against each of the defendants, including H.D. Smith:

- Count I – Injunctive Relief for Violations of Responsibilities and Duties Under the West Virginia Uniform Controlled Substances Act
- Count II – Damages Resulting from Negligence and Violations of the West Virginia Uniform Controlled Substances Act

- Count III – Violation of the West Virginia Consumer Credit and Protection Act (WVCCPA) Unfair Methods of Competition or Unfair or Deceptive Acts or Practices
- Count IV – Public Nuisance
- Count V – Negligence
- Count VI – Unjust Enrichment

(See Ex. A).

6.     Under Count I, the cause of action seeking injunctive relief for violations of the West Virginia Uniform Controlled Substances Act, H.D. Smith was alleged to have failed to respond to suspicious orders, thereby failing to provide effective controls and procedures to guard against the diversion of controlled substances.  (See Ex. A at p. 52, ¶21).

7.     H.D. Smith's alleged liability under Count I was based on the allegations that "[d]efendants have willfully and repeatedly violated the Uniform Controlled Substances Act and corresponding regulations."  (See Ex. A at p. 52, ¶22).

8.     Through Count I, the only relief sought against H.D. Smith was injunctive relief restraining H.D. Smith from continuing to violate the West Virginia Uniform Controlled Substances Act.  (See Ex. A at p. 52, ¶¶23-26).

9.     Under Count II, the State of West Virginia sought damages from H.D. Smith based on "repeated violations", including through alleged conspiratorial conduct, of the West Virginia Uniform Controlled Substances Act through:

a. Improper dispensing of prescriptions contrary to W.Va. Code §60A-3-308;
b. Engaging in prohibited acts contrary to W.Va. Code §§60A-4-401 through 403;
c. Deceiving and attempting to deceive medical practitioners in contravention of W.Va. Code §60A-4-410;
d. Disregarding the requirements of the Wholesale Drug Distribution Licensing Act of 1991, W.Va. Code §60A-8-1 *et seq.*; and
e. Conspiring to violate the West Virginia Uniform Controlled Substances Act.

(See Ex. A at p. 53, ¶28).

10.     H.D. Smith's alleged liability under Count II was based on allegations that H.D. Smith "willfully turned a blind eye" by regularly distributing large quantities of commonly-abused controlled substances to clients serving customers who can reasonably be expected to become addicted or to engage in illicit drug transactions.  (See Ex. A at p. 54, ¶30).

11.     Under Count III, the State of West Virginia sought damages from H.D. Smith based on violation of the West Virginia Consumer Credit and Protection Act, unfair methods of competition or unfair or deceptive acts or practices.  (See Ex. A at pp. 54-55, ¶¶33-41).

12.     H.D. Smith's alleged liability under Count III was based on allegations that H.D. Smith violated West Virginia regulations guarding against theft and diversion.  (See Ex. A at p. 55, ¶37).

13.     The State of West Virginia alleged that each violation is an unfair or deceptive act or practice.  (See Ex. A at p. 55, ¶38).

14.     The State of West Virginia alleged that H.D. Smith's "repeated violations were and are willful, and the State seeks civil penalties under W. Va. Code §46A-7-111(2) for each violation."  (See Ex. A at p. 55, ¶39).

15.     Under Count IV, the State of West Virginia sought damages from H.D. Smith based on the alleged creation of a public nuisance by failing to put effective controls and procedures in place to guard against theft and diversion of controlled substances; failure to design and operate a system to disclose suspicious orders of controlled substances; failure to inform the State of suspicious orders when discovered.  (See Ex. A at p. 56, ¶43).

16.     The State of West Virginia alleged that the Defendants, including H.D. Smith, "knew or should have known their conduct would cause hurt or inconvenience to the State of West Virginia."  (See Ex. A at p. 56, ¶43).

17.     The State of West Virginia alleged that the Defendants, including H.D. Smith, "negligently, intentionally and/or unreasonably interfered with the right of West Virginians to be free from unwarranted injuries, addictions, diseases, and sicknesses." (See Ex. A at p. 56, ¶44).

18.     The State of West Virginia alleged that the Defendants, including H.D. Smith, "were on notice that an epidemic from prescription drug abuse existed". (See Ex. A at p. 57, ¶48).

19.     The State of West Virginia alleged that the Defendants, including H.D. Smith, "knew or should have known that these substances were not being prescribed and consumed for legitimate medical purposes". (See Ex. A at p. 57, ¶50).

20.     The State of West Virginia sought damages from H.D. Smith based on the claim that it had sustained economic harm based on a list of alleged public nuisances created by H.D. Smith's lack of effective controls and procedures. (See Ex. A at p. 58, ¶¶51-53).

21.     Under Count V, the State of West Virginia sought damages from H.D. Smith based on its alleged conduct in the distribution of controlled substances and the failure to monitor and guard against third-party misconduct, causing the State of WV to incur costs related to diagnosis, treatment and cure of addiction or the risk of addiction. (See Ex. A at p. 59-60, ¶¶54-63).

22.     Under Count VI, the State of West Virginia sought damages from H.D. Smith based allegations that it has been unjustly enriched because the State of WV has incurred costs for law enforcement, legal and judicial resources and services, correctional resources and services, public welfare and service agencies, healthcare and medical services, drug abuse education, and lost revenue and costs from workplace accidents and employee absenteeism. (See Ex. A at pp. 60-61, ¶¶64-66).

23.     In April 2015, H.D. Smith moved to dismiss the Second Amended Complaint on a number of grounds, arguing that the State of West Virginia had failed to "plead Defendant-specific causation and Defendant-specific damages":

> Plaintiffs fail to satisfy this Court's requirement that they allege Defendant-specific facts because they do not allege that any H.D. Smith-supplied controlled substances dispensed to any person resulted in that person's arrest, prosecution, conviction, and incarceration. Plaintiffs do not allege that they have supplied treatment or rehabilitation services to any such person. Plaintiffs still allege nothing that would suggest H.D. Smith's liability to them, nor do they allege anything to separate H.D. Smith's allegedly causative conduct from the causative conduct of those who supplied, ingested, and abused controlled substances flooding into the State from out-of-State sources.

(See Ex. B, a copy of H.D. Smith's Memorandum in Support of its Motion to Dismiss and to Strike the Second Amended Complaint at pp. 19).

24.     H.D. Smith further argued that "no amount of discovery from H.D. Smith can supply facts sufficient to plead the still-missing elements of causation and damages.  Only these Plaintiffs can know what damages they allegedly incurred, and how – or even if – any controlled substance supplied pursuant to a "suspicious" order was dispensed to a person who then abused or diverted them in a way to cause these Plaintiffs any discernable damage."  (See Ex. B at p. 19).

25.     In its September 8, 2015 Order, though finding that Second Amended Complaint would "survive the collective Defendants' Motions to Dismiss", the Court stated that "if the Defendants raise the same arguments in a motion for summary judgment after discovery is completed, an entirely different result might be reached, once the summary judgment standard is applied with the allegations and the facts that are uncovered in discovery."  (See Ex. C, a copy of the Order on Defendants' Second Motions to Dismiss and Related Motions at pp. 2-3).

26.     In its October 2015 Answer and Affirmative Defenses to the Second Amended Complaint, H.D. Smith denied all allegations and asserted a number of affirmative defenses, including the following:

Tenth Affirmative Defense

Plaintiffs' claims against H.D. Smith are barred, in whole or in part, because they have suffered no damages as a result of the matters alleged in the Complaint.

Twenty-First Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, because the claims are speculative and remote; and because of the impossibility of ascertaining and allocating the alleged damages.

Twenty-Sixth Affirmative Defense

Plaintiffs' have not suffered, and will not suffer, any injury to a legally protected or cognizable interest by reason of the conduct of H.D. Smith as alleged in the Complaint.

(See Ex. D, a copy of H.D. Smith Wholesale Drug Company's Answer and Affirmative Defenses to the Second Amended Complaint at pp. 18, 20, 21).

27.     H.D. Smith maintained such defenses and positions up until it settled the Underlying Lawsuit.  See Ex. D, a copy of the transcript of the 30(b)(6) deposition of Joy Hayes at p. 18, ln 4 through p. 19, ln 14).

**B.     Undisputed Material Facts Regarding the Procedural History of This Litigation**

28.     On May 7, 2014, following a stay of the case by agreement of the parties and a period of limited discovery, H.D. Smith filed its motion for partial summary judgment regarding Cincinnati's alleged duty to defend H.D. Smith with respect to the Underlying Lawsuit.  [Doc. 23].

29.     Following completion of the briefing on H.D. Smith's motion for partial summary judgment, this litigation was stayed as to indemnity issues by text Order of August 20, 2014:

> For the reasons stated in the motion, the Court grants the motion. Fact discovery in this case on the duty to defend is extended until and including 11/29/2014. All proceedings related to the duty to indemnify are stayed until after the West Virginia Court concludes the litigation in State of West Virginia v. Amerisourcebergen Drug Corporation, et al., Civil Action No. 12-C-141, currently pending in the Circuit Court of Boone County, West Virginia or until an appropriate motion to lift the stay is granted.

[See Text Order of August 20, 2014 by U.S. Magistrate Judge Tom Schanzle-Haskins].

30.     In its decision of July 28, 2015 [Doc. 35], this Court granted summary judgment for Cincinnati and found it had no duty to defend H.D. Smith in relation to the Underlying Lawsuit; judgment was entered in Cincinnati's favor on August 21, 2015 and the case was terminated.  [Doc. 38].

31.     H.D. Smith filed an appeal of the summary judgment decision to the 7th Circuit Court of Appeals on August 24, 2015.  [Doc. 39].

32.     In its ruling of July 19, 2016, though noting that the Underlying Lawsuit asserted numerous legal theories and seeks a variety of remedies, the 7th Circuit determined that Cincinnati was obligated to defend H.D. Smith because the Underlying Lawsuit presented potential liability for H.D. Smith in relation to damages because of "bodily injury" incurred by the State of West Virginia in relation to hospital services and costs related to the diagnosis, treatment and cure of addiction.  *Cincinnati Ins. Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771, 774-5 (7th Cir. 2016).

33.     Following the 7th Circuit's decision, the litigation was re-opened before this Court by Order August 31, 2016. [Doc. 47].

34.     H.D. Smith filed its Amended Counterclaim for Declaratory Relief and Damages on February 23, 2017 which included a claim for damages under 215 ILCS 5/115 based on Cincinnati's failure to pay for H.D. Smith's settlement of the Underlying Lawsuit.  [Doc. 52].

35.     Cincinnati responded to Amended Counterclaim for Declaratory Relief and Damages on March 9, 2017, specifically denying any liability for damages, including damages under 215 ILCS 5/115.  [Doc. 53].

### C.     Undisputed Material Facts Regarding the Cincinnati Policies

36.     Cincinnati issued Commercial General Liability Coverage and Commercial Umbrella Liability Coverage to H.D. Smith from January 2001 through the January 2018 (the "Cincinnati Policies". These policies were issued for one-year periods beginning January 15, 2001 and were renewed on an annual schedule, with the most recent policies effective from January 15, 2017 to January 15, 2018.[2]

37.     The Cincinnati Policies only apply to sums that H.D. Smith becomes legally obligated to pay as damages because of "bodily injury" which is caused by an "occurrence" and to which the insurance otherwise applies. (See Ex. F at CIN001007; Ex. G at CIN001533).

38.     The Cincinnati Primary Policies define "bodily injury" as follows:

> "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

(See Ex. F at CIN001023).

39.     The Cincinnati Umbrella Policies define "bodily injury" as follows;

> "Bodily injury" means bodily harm or injury, sickness, disease, disability, humiliation, shock, fright, mental anguish or mental injury, including care, loss of services or death resulting from any of these at any time.

---

[2] The Cincinnati Policies are substantively identical as it relates to the language at issue in this Motion.  Thus, for the sake of efficiency, only the 2012 policies are attached as representative copies of the Cincinnati Policies.

(See Ex. G at CIN001546)

40.     "Occurrence" is defined in the Cincinnati Primary Policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (See Ex. F at CIN001025).

41.     "Occurrence" is defined in the Cincinnati Umbrella Policies in pertinent part as:

> a.     "an accident including continuous or repeated exposure to substantially the same general harmful conditions, that results in 'bodily injury' or 'property damage';

(See Ex. G at CIN001548).

42.     The Cincinnati Primary Policies and Cincinnati Umbrella Policies contain the following, or substantively similar, exclusion regarding "Expected and Intended Injury":

> This insurance does not apply to:
>
> Expected or Intended Injury
>
> "Bodily injury" or "property damage" which may reasonably be expected to result from the intentional or criminal acts of the insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually expected or intended. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

(See Ex. F at CIN001008; Ex. G at CIN001535-6).

### D.     Undisputed Material Facts Pertinent to the H.D. Smith Settlement and Communications with Cincinnati Regarding the Settlement

43.     As of the 7th Circuit Court of Appeal's Order of July 19, 2016, Cincinnati was required to pay for H.D. Smith's defense in relation to the Underlying Lawsuit. *Cincinnati Ins. Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771, 774-5 (7th Cir. 2016).

44.     In a July 29, 2016 communication from H.D. Smith defense counsel to counsel for the State of West Virginia, H.D. Smith offered $2,000,000 despite counsel's statement that "five months from trial" she had "no idea what damages plaintiffs are claiming against my client

or how they are proving those claims."  (See Ex. H, a copy of a July 29, 2016 email from H.D. Smith counsel to counsel for the State of West Virginia).

45.      In that July 29, 2016 communication from H.D. Smith defense counsel to counsel for the State of West Virginia, counsel for H.D. Smith reiterated her request for damages information. (See *Id*.)

46.      It was H.D. Smith's position that, as of that July 29, 2016 communication from H.D. Smith defense counsel to counsel for the State of West Virginia, the State of West Virginia had not provided damages information to anyone in the case.  (See Ex. E, Hayes deposition at p. 37, ln 6-22).

47.      As reflected in emails of August 19, 2016 between H.D. Smith and its counsel, H.D. Smith's settlement position was influenced by "reputational ramifications" and considerations that up to half of the settlement proceeds be earmarked for the "Fight Substance Abuse Fund", a fund created by West Virginia Statute in relation to the State's substance abuse issues.  (See Ex. I, a copy of two August 19, 2016 emails from H.D. Smith counsel).

48.      H.D. Smith reached an agreement in principle to settle the Underlying Lawsuit for $3,500,000 on or about August 22, 2016.  (See Ex. E, Hayes deposition at p. 27, ln 3-9; Ex. J, a copy of two August 22, 2016 emails from H.D. Smith counsel).

49.      Cincinnati was not involved in or informed of H.D. Smith's settlement discussions of July and August 2016, learning of the settlement only after it occurred. (See Ex. E, Hayes deposition at p. 44, ln 1-20).

50.      By letter dated October 24, 2016, counsel for H.D. Smith advised Cincinnati that it was close to completing its settlement with the State of West Virginia and demanded that Cincinnati commit to paying the entire settlement on behalf of H.D. Smith.  As stated in that

letter, H.D. Smith continued to dispute all liability, misconduct or fault in relation to the claims and damages at issue in the Underlying Lawsuit.  H.D. Smith counsel argued that the settlement was reasonable and must be paid by Cincinnati was based on a comparison of H.D. Smith's "market share" in comparison to other settling parties.  (See Ex. K, a copy of an October 24, 2016 letter from H.D. Smith  counsel to counsel for Cincinnati).

51. Though by this time Cincinnati's duty to pay for H.D. Smith's defense had been determined by the 7th Circuit's July 2016 decision and, therefore, H.D. Smith would not be responsible for such costs, H.D. Smith counsel also argued that the settlement was reasonable based on the anticipated costs of preparing for trial which had been estimated at $2.4 million, more than $1,000,000 less than the amount that H.D. Smith had agreed to pay.  (Id.).

52. The purpose of the October 24, 2016 letter was "to convey the settlement that was reached from a dollar amount perspective and the reasoning behind it to Cincinnati."  (See Ex. E, Hayes deposition at p. 44, ln 11-15).

53. As acknowledged by H.D. Smith, however, the burden for defense costs for the Underlying Lawsuit would have been Cincinnati's burden and not H.D. Smith's burden as a result of the 7th Circuit Court of Appeals decision.  (See Ex. E, Hayes deposition at p. 46, ln 5-15).

54. Though used as a justification for settlement in the October 24, 2016 letter from its counsel, H.D. Smith's actual position is that "market share data had nothing to do with any potential liability in the State of West Virginia."  (See Ex. E, Hayes deposition at p. 48, ln 11 to p. 49, ln 6).

55. By letter dated December 15, 2016, counsel for H.D. Smith reiterated the demand that Cincinnati commit to paying the entire settlement on behalf of H.D. Smith, but provided no

additional support for such position.  (See Ex. L, a copy of a December 15, 2016 letter from H.D. Smith  counsel to counsel for Cincinnati).

56.     On December 28, 2016, H.D. Smith executed its settlement agreement with the State of West Virginia settling all claims asserted against H.D. Smith in the Second Amended Complaint.  (See Ex. M, a copy of H.D. Smith's settlement agreement with the State of West Virginia).

57.     By letter dated January 13, 2017, Cincinnati provided its position in response to H.D. Smith's demand that Cincinnati pay the entire settlement on behalf of H.D. Smith, noting that coverage for some or all of the claims at issue was still in dispute; that H.D. Smith had not through discovery or otherwise provided Cincinnati with information supporting H.D. Smith's contention that the amount it has agreed to pay to the settle the West Virginia Lawsuit related, in whole or in part, to covered damages; and that H.D. Smith not involved Cincinnati in the negotiation of the settlement and, therefore, Cincinnati was not provided with information during that process regarding the nature and extent of H.D. Smith's alleged liability.  (See Ex. N, a copy of a January 13, 2017 letter from Cincinnati counsel to counsel for H.D. Smith).

58.     By letter dated January 26, 2017, counsel for H.D. Smith responded to Cincinnati's January 13, 2017 letter, providing none of the additional information requested by Cincinnati and instead stating that the October 24, 2016 "provided detailed information" about the terms of the settlement and the reasons why H.D. Smith decided to settle.  (See Ex. O, a copy of a January 26, 2017 letter from H.D. Smith  counsel to counsel for Cincinnati).

59.     All six causes of action stated in the Second Amended Complaint were still at issue when H.D. Smith settled the Underlying Lawsuit.  (See Ex. E, Hayes deposition at p. 13, ln 17 to p. 14, ln 4).

60.     Up to the date that H.D. Smith settled the Underlying Lawsuit, H.D. Smith disputed liability with respect to all causes of action stated in the Second Amended Complaint. (See Ex. E, Hayes deposition at p. 15, ln 9-16).

61.     In her deposition, H.D. Smith's corporate representative admitted that there might not be coverage for many of the claims or damages sought from it by means of the Second Amended Complaint, including Count I, Count II, Count III in particular.  (See Ex. E, Hayes deposition at p. 10, ln 8 to p. 13, ln 16).

62.     The stated basis for H.D. Smith's assertion of its counterclaim against Cincinnati under 215 ILCS 5/115 is Cincinnati's refusal to pay the settlement after multiple requests. [Doc. 52]; (See Ex. E, Hayes deposition at p. 60, ln 11-24).

63.     H.D. Smith contends that, as of the February 24, 2017 filing of its counterclaim against Cincinnati under 215 ILCS 5/115, it had provided Cincinnati an explanation as to why they had settled. (See Ex. E, Hayes deposition at p. 61, ln 1-9).

64.     On March 13, 2017, more than six months after it had agreed to settle and more than nine months after it had been unsealed in the Underlying Lawsuit, H.D. Smith provided Cincinnati for the first time with a copy of the January 2015 Second Amended Complaint filed in the Underlying Lawsuit, the complaint that contained the H.D. Smith-specific allegations required by the West Virginia Court and that was in place and forming the basis of H.D. Smith's 2016 settlement discussions.  (See Ex. P, Affidavit of Brian M. Reid at ¶3).

65.     Due to the phasing of discovery before the Court in this coverage action, H.D. Smith limited its initial discovery responses solely to information and issues which it felt related to Cincinnati's duty to defend.  (See Ex. E, Hayes deposition at p. 54, ln 11 to p. 55 ln 2).

66.     In April and May 2017, more than seven months after it had agreed to settle the Underlying Lawsuit, H.D. Smith provided Cincinnati for the first time with a supplemental production related to the Underlying Lawsuit, including copies of pleadings and written discovery responses, copies of the document productions by H.D. Smith and the State of West Virginia, and copies of deposition transcripts for depositions taken in the Underlying Lawsuit. (See Ex. P, Affidavit of Brian M. Reid at ¶4).

## III.     ARGUMENT[3]

### A.     Standard for Summary Judgment and Burden of Proof

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  F.R.C.P. 56(c); *see also CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 676-677 (7th Cir. 2001). The movant's burden is to show that there is an absence of evidence to support the non-moving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The party bearing the burden of proof at trial and opposing the motion must then produce "specific facts showing that there is a genuine issue for trial." See F.R.C.P. 56(e); *Celotex*, 477 U.S. at 324.

H.D. Smith, as the party seeking coverage, bears the burden to prove that the claim falls within the coverage grant of the Cincinnati Policies.  *Erie Ins. Group v. Sears Corp.*, 102 F.3d 889, 893 (7th Cir. 1996).  The Court "should not simply look to the particular legal theories pursued by the [plaintiff in the underlying lawsuit], but must focus on the allegedly tortious

---

[3] A federal court sitting in diversity "applies the choice-of-law rules of the forum state to determine which state's substantive law applies." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009). As agreed by the parties during prior summary judgment briefing, based upon Illinois choice of law factors, the analysis of Cincinnati's duty to indemnify H.D. Smith should be performed under Illinois law.

conduct on which the lawsuit is based." *Medmarc Cas. Ins. Co. v. Avent Am., Inc*., 612 F.3d 607, 613 (7th Cir. 2010); *see also Del Monte Fresh Produce N.A., Inc. v. Transp. Ins. Co.*, 500 F.3d 640, 644 (7th Cir. 2007) ("The important question is therefore whether the tendered complaint alleges facts that, if proved, would show that the insured has committed acts that fall within the policy's coverage."). Further, under Illinois law, a Court need not consider each count in isolation when the plaintiff has not pleaded the counts in the alternative. *See SCR Medical Transportation Services Inc. v. Browne*, 781 N.E.2d 564, 569 (Ill.App.Ct. 2002) (*citing Lexmark International, Inc. v. Transportation Insurance Co.*, 761 N.E.2d 1214, 1221-22 (Ill.App.Ct. 2001).

     **B.**    **Cincinnati Owes No Obligation to Cover the H.D. Smith Settlement because it was not made in Reasonable Anticipation of Liability for Covered Claims**

H.D. Smith settled the Underlying Lawsuit, securing the release of the claims stated under each of the six causes of action contained in the Second Amended Complaint. As is evident from the Second Amended Complaint, the State of West Virginia sought a wide array of damages from H.D. Smith, including injunctive relief (Count I), fines and penalties based on statutory violations (Count II and Count III), and damages in the form of allegedly increased costs for public services relating to law enforcement, health care, court and prosecutorial resources, and jail and prison resources (Count IV), and damages in the form of unjust enrichment (Count VI). (See Ex. A). H.D. Smith's actual liability aside, it is evident from the face of the Second Amended Complaint that much of the relief sought does not even arguably qualify as damages because of "bodily injury" caused by an "occurrence" as it must to be covered by the Cincinnati Policies. Nevertheless, H.D. Smith demands that Cincinnati pay the entirety of its settlement of the Underlying Lawsuit. Yet, H.D. Smith did not involve Cincinnati in the settlement process and has made no attempt to demonstrate that the focus of its settlement

was its potential liability for claims presenting damage that would have been covered under the Cincinnati Policies.  (See Ex. E, Hayes deposition at p. 44, ln 1-20; Ex. K; Ex. L; Ex. Q).

The duty to indemnify is narrower than the duty to defend. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1221 (Ill. 1992). The duty to defend arises when allegations in the underlying complaint fall potentially within coverage. *Id*.  In contrast, the duty to indemnify "is only ripe for consideration if the insured has already incurred liability in the underlying claim against it"—i.e., through judgment or settlement—and "arises if the insured's activity and the resulting loss or damage *actually* fall within the [omitted] policy's coverage." *Id*. (emphasis in original); *American Family Mutual Insurance Co. v. Niebuhr*, 860 N.E.2d 436, 440 (Ill.App.Ct. 2006).  As determined by the 7th Circuit, the presence of potentially-covered "bodily injury" damages required that Cincinnati defend H.D. Smith.  However, Cincinnati's indemnity obligation only arises if it is *actually* established that that H.D. Smith's liability is a covered liability under the Cincinnati Policies.

As stated by the 7th Circuit, under Illinois law, if an insured settles an underlying claim before trial, "it must show that it settled an otherwise covered loss in reasonable anticipation of liability" for the duty to indemnify to apply. *Selective Insurance Company of South Carolina v. Target Corp.*, 845 F.3d 263, 270-1 (7th Cir. 2016); *Caterpillar, Inc. v. Great Am. Ins. Co*., 62 F.3d 955, 966–67 (7th Cir. 1995) (citing *United States Gypsum Co. v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1244 (Ill.App.Ct. 1994)); see also *Rosalind Franklin Univ. of Med. & Sci. v. Lexington Ins. Co.*, 8 N.E.3d 20, 39 (Ill.App.Ct. 2004) ("When an insured settles an underlying claim, it must show that the settlement was made in reasonable anticipation of liability for an otherwise covered loss.").  When an insured settles the underlying lawsuit prior to a trial, the insurer need only indemnify the settlement payments made in reasonable anticipation of liability

for damages covered under the policy. *Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 483 Fed.Appx. 285, 286 (7th Cir. 2012). H.D. Smith expressly acknowledged that coverage might not be available in relation to at least some of the claims made against it in the Second Amended Complaint. (See Ex. E, Hayes deposition at p. 10, ln 8 to p. 13, ln 16). H.D. Smith did not, however, made any attempt to allocate its settlement as between claims it states are covered versus those that would not be covered.

In cases where an insured enters into a settlement that disposes of both covered and non-covered claims, the insurer's duty to indemnify encompasses the entire settlement if the covered claims were "a primary focus of the litigation." *Commonwealth Edison Co. v. National Union Fire Insurance Co.*, 752 N.E.2d 555, 565-66 (Ill.App.Ct. 2001); see *Federal Insurance Co. v. Binney & Smith, Inc.*, 913 N.E.2d 43, 53-4 (Ill.App.Ct. 2009) (following the "primary focus" standard articulated in *Commonwealth Edison*, the court found that the insured was not required to allocate liability within a settlement that contained both a covered consumer fraud claim and a non-covered warranty claim); *Santa's Best Craft, LLC v. St. Paul Fire & Marine Insurance Co.*, 611 F.3d 339, 352 (7th Cir. 2010) (under Illinois law, insurer must reimburse settlement if a "primary focus" of the claims that were settled was a potentially covered loss). Conversely, if the "primary focus" of the claims that were settled is not a covered loss, then the insurer is not required to reimburse the settlement. *Id.*; see *Rosalind*, 8 N.E.3d at 39-40 (where an insured enters into a settlement that disposes of both covered and non-covered claims, the insurer's duty to indemnify encompasses the entire settlement if the covered claims were a "primary focus" of the litigation) (citing *Santa's Best*, 611 F.3d at 352).

The first question is whether H.D. Smith settled an otherwise covered loss in reasonable anticipation of liability. *Selective Insurance Company of South Carolina v. Target Corp.*, 845

F.3d 263, 270-1 (7th Cir. 2016). If so, the second question is whether the covered claims were a primary focus of the litigation. *Id.*

### 1.   H.D. Smith Cannot Establish that it Settled an Otherwise Covered Loss in Reasonable Anticipation of Liability

When an insured settles before trial, comparing the underlying complaint allegations to insurance policies is appropriate for determining whether particular claims are covered. *Fox v. Admiral Insurance Co*. 2016 WL 3520145 at *4 (N.D.Ill. 2016); *See Maryland Cas. Co. v. Dough Mgmt. Co.*, 36 N.E.3d 953, 959-61 (Ill.App.Ct. 2015) (determining that insurer had no duty to indemnify insured's pretrial settlement by comparing allegations of underlying complaint to insurance policy and finding the claims excluded from coverage); *Am. Home Assur. Co. v. Dykema, Gossett, Spencer, Goodnow & Trigg*, 811 F.2d 1077, 1083–85 (7th Cir. 1987) (the "first inquiry" for determining insurer's duty to indemnify insured's settlement was to determine whether the underlying claims were covered by the insurance policy; "[b]ecause the case was settled before trial, [the complaint's] allegations are accepted as true for purposes of determining insurance coverage")(applying Michigan law). To recover a settlement, the insured " 'need not establish actual liability to the party with whom it has settled "so long as a potential liability on the facts known to the [insured is] shown to exist, culminating in an amount reasonable in view of the size of possible recovery and degree of probability of claimants success against the insured." ' " *U.S. Gypsum Co*., 643 N.E.2d at 1244, *quoting Luria Brothers & Co. v. Alliance Assurance Co*., 780 F.2d 1082, 1091 (7th Cir.1986). Thus, H.D. Smith, as the insured, has burden of proving that "it settled an otherwise covered loss." *Binney & Smith,* 913 N.E.2d at 53-54.

In ruling on the duty to defend motion, this Court held that certain causes of action posed the possibility of damages caused by an alleged "occurrence." [Doc. 35 at p. 14]. The 7th Circuit

then found that Cincinnati owed a duty to defend because certain damages sought from H.D. Smith constituted damages because of "bodily injury." *Cincinnati Ins. Co*., 829 F.3d 771, 774-5 (7th Cir. 2016).  The possibility that H.D. Smith's liability might include damages because "bodily injury" caused by an "occurrence" was found to be sufficient to require that Cincinnati provide H.D. Smith with a defense. *Outboard Marine Corp.*, 607 N.E.2d at 1220-1.  However, under Illinois law, Cincinnati's indemnity obligations only arise when the insured's activity and the resulting loss or damage actually fall within the coverage afforded by the Cincinnati Policies. *Id*. at 1221.

The Second Amended Complaint alleged that H.D. Smith's regular and persistent business practices in violation of West Virginia law contributed to the prescription drug abuse epidemic. (See Ex. A at ¶¶ 15, 15.g., 50).  It is specifically alleged that H.D. Smith was on notice of the growing epidemic concerning drugs it distributed to West Virginia.  (See Ex. A at ¶¶ 2, 14, 48).  It is specifically alleged that H.D. Smith acts consisted of willful and repeated violations of WV laws and regulations (See Ex. A at ¶¶ 22, 39].  Further, it is expressly alleged that H.D. Smith willfully turned a blind eye toward actual facts regarding distribution and abuse of the controlled substances and West Virginia's problems. (See Ex. A at ¶¶ 15.g.(cc), 30).  In sum, the Underlying Lawsuit is based on allegations that H.D. Smith knew what was happening, but continued to intentionally and willfully send unwarranted amounts of controlled substances into West Virginia that could only lead to one result – illicit use and a compounding of the State's prescription drug abuse epidemic.  The causes of action stated by West Virginia were not pleaded in the alternative.  In addition, each cause of action in the Second Amended Complaint incorporates and realleges all prior allegations in the complaint.  Thus, each and every cause of action in the Second Amended Complaint, even those using the word "negligence," incorporates

and relies upon allegations of willful misconduct, a persistent course of conduct in violation of West Virginia law, and conscious disregard of the prescription drug abuse epidemic.  Under these circumstances, this Court need not consider each count in isolation. *See SCR Medical*, 781 N.E.2d at 569 (Ill.App.Ct. 2002).

Pursuant to the insuring agreements, in order for coverage under the Cincinnati Policies to apply, the damages at issue must have been caused by an "occurrence". (See Ex. F at CIN001007; Ex. G at CIN001533). The Cincinnati Policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (See Ex. F at CIN001025; Ex. G at CIN001548). When interpreting that clause, Illinois courts define the term "accident" to mean "an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned sudden or unexpected event of an inflictive or unfortunate character." *Viking Constr. Mgmt, Inc. v. Liberty Mut. Ins. Co.*, 831 N.E.2d 1, 6 (Ill.App.Ct. 2005).   Illinois courts have also found that, although the use of the word "occurrence" in insurance policies broadens coverage and eliminates the need to find an exact cause of damages as long as they are neither intended nor expected by the insured, the "occurrence" must still be "accidental." *Aetna Casualty & Sur. Co. v. Freyer*, 411 N.E.2d 1157, 1159 (Ill.App.Ct. 1980).

Illinois law requires a court to consider whether the insured should have expected his act to cause the resulting injury. Even "if the person performing the act did not intend or expect the result, if the result is the rational and probable consequence of the act, or, stated differently, the natural and ordinary consequence of the act, it is not an accident." *Stoneridge Dev. Co. v. Essex Ins. Co.*, 888 N.E.2d 633, 652 (Ill.App.Ct. 2008).  Expected injuries are "those that should have been reasonably anticipated by the insured." *Farmers Auto. Ins. Ass'n v. Danner*, 967 N.E.2d

836, 843 (Ill.App.Ct. 2012).   Injuries are considered "expected" and excluded from coverage where the insured was consciously aware the injuries were practically certain to be caused by the conduct.  *Id.*; *Bay State Ins. Co. v. Wilson*, 451 N.E.2d 880, 882-3 (Ill. 1983).

In addition to requiring that the damages arise from an "occurrence", the Cincinnati Policies contain exclusions which bar coverage for "bodily injury" which may reasonably be expected to result from the intentional or criminal acts of the insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually expected or intended. (See Ex. F at CIN001008; Ex. G at CIN001535-6).   When construing policy exclusions for bodily injury that is expected or intended by the insured, courts have held that the injury is "expected" where the damages are " 'of such a nature that they should have been reasonably anticipated (expected) by the insured.' " *Westfield National Insurance Co. v. Continental Community Bank & Trust Co.*, 804 N.E.2d 601, 608 (Ill.App.Ct. 2003) (quoting *Freyer*, 411 N.E.2d at, 1159).  Whether an injury was "expected" is a subjective question, but it can be inferred from objective evidence that the injury was the natural and probable result of the act. *Wilson*, 451 N.E.2d at 883. The terms "intended" and "expected" are not synonymous, and a greater degree of proof is required to establish "intent" than to establish "expectation." *Id.*, citing *Farmers Automobile Insurance Ass'n v. Medina*, 329 N.E.2d 430, 436 (Ill.App.Ct. 1975) (Moran, J., specially concurring).   Injury is "expected" where the damages are not accomplished by design or plan, i.e., not "intended," but are "of such a nature that they should have been reasonably anticipated (expected) by the insured." *Freyer*, 411 N.E.2d at, 1159.

In excluding claims for bodily injury <u>reasonably expected</u> to result from an insured's intentional acts, the Court should employ an objective, rather than a subjective standard by which to gauge the insured's conduct. *Allstate Indem. Co. v. Hieber*,  24 N.E.3d 139, 146 (Ill.App.Ct.

2014)(emphasis added); *see also Aetna Casualty & Surety Co. v. Dichtl*, 398 N.E.2d 582, 587 (Ill.App.Ct. 1979) ("[T]he word 'reasonably' is indicative of an objective standard."); *Allstate Insurance Co. v. Brown*, 16 F.3d 222, 226 (7th Cir.1994) ("[W]e note that we are not the first jurisdiction to interpret the Allstate exclusion at issue here. Many other jurisdictions have addressed the meaning of the intentional or criminal acts exclusion and have found it unambiguous and providing an objective standard. [Citations omitted.](applying Indiana law).

Under Illinois law, when an insured settles before trial, comparing the underlying complaint allegations to insurance policies is appropriate for determining whether particular claims are covered. See *Fox*, 2016 WL 3520145 at *4; *Maryland Cas. Co.*, 36 N.E.3d at 959-61; *Am. Home Assur. Co.*, 811 F.2d at 1083–85. The Underlying Lawsuit is based on allegations that H.D. Smith knew or should reasonably have known what was happening in the State of West Virginia based on the large volumes of controlled substances being shipped to that State. (See e.g. Ex. A at ¶43). That is the entire basis of the Underlying Lawsuit and, therefore, the only basis on which damages could have been awarded - that H.D. Smith was aware of the problem but continued to fill suspicious orders and/or failed to exercise due care owed by a party responsible for the distribution of controlled substances. (See Ex. A at ¶¶2; 14; 15(g); 21; 30; 39; 43; 45; 48; 50; 51; 58). It is also alleged that H.D. Smith conspired to violate the West Virginia Uniform Controlled Substances Act. (See Ex. A at ¶28). The results, the prescription drug epidemic and the related costs incurred as a result which were being sought from H.D. Smith were, according to the State of West Virginia, is the natural result of H.D. Smith's having turned a blind eye to the issue. Such alleged damages should reasonably have been expected to occur when, as required since the matter was settled prior to trial, the State of West Virginia's allegations to that effect are taken as true and H.D. Smith's conduct is viewed under an objective

standard.  As a result, there is no coverage under the Cincinnati Policies because any "bodily injury" caused by H.D. Smith could reasonably be expected to have resulted from the acts alleged by the State of West Virginia.

Even if the alleged "bodily injury" damages could not have been reasonably expected to have resulted from its intentional distribution of controlled substances to the State of West Virginia, H.D. Smith must still establish that it had a reasonable anticipation of liability for "bodily injury" damages.  *Selective*, 845 F.3d at 270-1.  The determination of whether H.D. Smith's alleged anticipation of liability was reasonable would turn on the "quality and quantity of proof" which H.D. Smith would expect to be offered against it in the underlying action. *Binney & Smith,* 913 N.E.2d at 49; *U.S. Gypsum Co.*, 643 N.E.2d at 1245.  The burden of proving reasonableness falls on the insured both out of fairness, since the insured was the one who agreed to the settlement, and out of practicality, since the insured will have better access to the facts bearing upon the reasonableness of the settlement.  *Guillen ex rel. Guillen v. Potomac Insurance Co. of Illinois*, 785 N.E.2d 1, 14-15 (Ill. 2003). The insurer retains the right to rebut a showing of reasonableness with its own affirmative evidence bearing on the reasonableness of the settlement agreement. *Id*.

Here, in making its demand to Cincinnati, H.D. Smith failed to present any information on the "quality and quantity of proof" which H.D. Smith would expect to be offered against it in the underlying action at all, much less as to its alleged liability for "bodily injury" damages. (See Ex. K; L; Q).  Rather, H.D. Smith simply stated that the defense might be expensive and that its settlement number was reasonable in comparison to other parties' settlements when view in relation to such parties' market share.  (*Id*.).  H.D. Smith did not and has not offered any evidence or explanation for an alleged "anticipation of liability."  Of course, given the 7th

Circuit's ruling that Cincinnati had a duty to defend, H.D. Smith was aware as of July 19, 2016 that it would not be required to bear the expense of its defense.  Further, H.D. Smith has admitted that the market share information had nothing to do with any potential liability in relation to the Underlying Lawsuit.  (See Ex. E, Hayes deposition at p. 46, ln 5-15).  Finally, H.D. Smith's alleged anticipation of liability is belied by the facts and its own arguments.

In its Motion to Dismiss the Second Amended Complaint, H.D. Smith stated that the State of West Virginia had failed to allege that any H.D. Smith-supplied controlled substances dispensed to any person resulted in that person's arrest, prosecution, conviction, and incarceration or that they had supplied treatment or rehabilitation services to any particular person. (See Ex. B at p. 19).  H.D. Smith stated that the State of West Virginia had alleged nothing that would suggest H.D. Smith's liability to them, nor anything to separate H.D. Smith's allegedly causative conduct from the causative conduct of others.  (*Id*.).  Though the Boone County Court denied H.D. Smith's motion to dismiss, the Court stated that "if the Defendants raise the same arguments in a motion for summary judgment after discovery is completed, an entirely different result might be reached, once the summary judgment standard is applied with the allegations and the facts that are uncovered in discovery."  (See Ex. C at pp. 2-3).

Whether the alleged conduct was properly actionable, H.D. Smith argued that the State of West Virginia could not tie any alleged damages to H.D. Smith-supplied controlled substances and was aware that its arguments might well succeed if properly supported in a summary judgment motion.  In fact, up until it settled the Underlying Lawsuit, H.D. Smith maintained the position was that the State of West Virginia's claims against H.D. Smith were barred because: it had suffered no damages as a result of the matters alleged in the Complaint; the claims were speculative and remote; because of the impossibility of ascertaining and allocating the alleged

damages; and because it had not suffered, and will not suffer, any injury to a legally protected or cognizable interest by reason of the conduct of H.D. Smith as alleged in the Second Amended Complaint.  (See Ex. E, Hayes deposition at p. 18, ln 4 through p. 19, ln 14).

H.D. Smith's alleged anticipation of liability is further belied by the fact that, in the midst of H.D. Smith's settlement discussions with the State of West Virginia in July 2016, H.D. Smith defense counsel conveyed a $2,000,000 offer despite the fact that "five months from trial" counsel had "no idea what damages plaintiffs are claiming against my client or how they are proving those claims" and counsel reiterated her request for damages information.  (See Ex. H, a copy of a July 29, 2016 email from H.D. Smith counsel to counsel for the State of West Virginia).  As of that July 29, 2016 communication, it was H.D. Smith's position that the State of West Virginia had not provided damages information to anyone in the case.  (See Ex. E, Hayes deposition at p. 37, ln 6-22).  Further, as reflected in emails of August 19, 2016 between H.D. Smith and its counsel, H.D. Smith's settlement position was influenced by "reputational ramifications" and it was proposing that up to half of the settlement proceeds be earmarked for the "Fight Substance Abuse Fund", a fund created by West Virginia Statute in relation to the State's substance abuse issues, rather than accepted by the State of West Virginia as payment for alleged damages.  (See Ex. I, a copy of two August 19, 2016 emails from H.D. Smith counsel).

H.D. Smith must establish both (1) that it settled an otherwise covered loss and (2) that it did so in reasonable anticipation of liability for Cincinnati's duty to indemnify to apply.  The failure by H.D. Smith to meet one or both of those requirements for the reasons explained above means that Cincinnati has no obligation to pay for the settlement.

### 2.    H.D. Smith cannot Demonstrate that Covered Claims were a Primary Focus of the Litigation

If this Court finds that the H.D. Smith settlement included damages covered under the

28

Cincinnati Policies and that H.D. Smith can establish that is settled due to a reasonable anticipation of liability, the settlement will then have disposed of both covered and non-covered claims.  In that event, Cincinnati's duty to indemnify encompasses the entire settlement only if the covered claims were "a primary focus of the litigation." *Commonwealth Edison*, 752 N.E.2d at 565-66 555, *Binney & Smith*, 913 N.E.2d at 53-4; *Santa's Best*, 611 F.3d at 352.  Conversely, if the "primary focus" of the claims that were settled is not a covered loss, then Cincinnati is not required to reimburse the settlement. *Id*.  H.D. Smith cannot make that showing here.

In making this "primary focus" determination at the summary judgment stage, courts look to the pleadings and the record of the underlying litigation. See *Santa's Best*, 611 F.3d at 350 ("Both *Gypsum* and *Edison* relied on the record developed in the underlying action, including allegations in the complaint and evidence presented in the coverage action...or the evidence presented in underlying companion cases that went to trial before settling...to conclude that the settlement resolved litigation primarily focused on covered damage"); *Essex Insurance Company v. Village of Oak Lawn*, 2016 WL 4011228 at *7 (N.D.Ill. 2016).  Where "the parties contest whether the settlement was made in anticipation of covered claims, the burden should be on the insured to prove coverage of the settlement in the first place and then on the insurer to prove the existence of exclusions barring coverage." *Santa's Best*, 611 F.3d at 352; *Essex*, 2016 WL 4011228 at *9.

As stated in its Amended Counterclaim, H.D. Smith has "demanded that CIC pay the amount of the settlement consistent with the terms of its Policies and consistent with this Court's ruling that CIC has a duty to defend." [Doc. 52 at ¶¶17-20].  That decision that was based on the finding that the Underlying Lawsuit potentially sought damages because of "bodily injury" caused by an "occurrence".  Thus, to the extent that H.D. Smith has attempted to justify its

position at all, it appears that it is demanding payment of the entirety of its settlement with the State of West Virginia on those grounds.

The Underlying Lawsuit, however, included a number of causes of action and sought a variety of relief that does not even potentially qualify as damages because of "bodily injury" caused by an "occurrence" as required by the insuring agreement in the Cincinnati Policies.  The injunctive relief sought under Count I does not meet that requirement and, therefore, any costs that might have been charged to or incurred by H.D. Smith in relation to that claim would not be covered.  (See Ex. A at ¶¶17-26).  Upon review of the statute, the relief that might be awarded under the Sections of the West Virginia Uniform Controlled Substances Act cited in Count II are also not covered:

- W.Va. Code §60A-3-308 does not itself provide for an award of damages;
- W.Va. Code §§60A-4-401 through 403 provide for fines or imprisonment for criminal conduct, violation of §60A-3-308, and certain knowing or intentional conduct relating to the manufacture, distribution and possession of a controlled substance respectively;
- W.Va. Code §60A-4-410 provides for fines up to $2,500 or imprisonment for knowingly withholding information from a medical practitioner;
- W.Va. Code §60A-8-1 et seq. provides for fines of $200 to $1,000 for the violation of §60A-8-7 which concerns wholesale drug distributor licensing requirements.

(See Ex. A at ¶¶27-32; W.Va. Code §60A-1-101 et seq.).

The same is true as to the relief that might be awarded under Count III for alleged violations of the West Virginia Consumer Credit and Protection Act (WVCCPA).  (See Ex. A at ¶¶33-41). First, it is alleged that H.D. Smith's repeated violations were willful and that the State of West Virginia seeks civil penalties for each violation under W.Va. Code §46A-7-111(2).  (See Ex. A at ¶39).  Second, as provided by §46A-7-111(2) the attorney general may bring a civil action to recover a civil penalty for willfully violating this chapter, and if the court finds that the defendant has engaged in a course of repeated and willful violations of this chapter, it may assess a civil penalty of up to $5,000 for each violation of the WVCCPA.  Under W. Va. Code §46A-7-

108, the attorney general may also bring a civil action to restrain a person from violating this chapter and for other appropriate relief.  Thus, the available relief is based on intentional conduct and comes in the form of fines assessed on a "per violation" basis as opposed to a demonstration of injury to any person caused by such violations.

The claim under Count IV for public nuisance damages similarly includes many forms of damages other than "bodily injury" based on alleged "damage, hurt or inconvenience to the public health, the public safety, and the general welfare of the citizens of West Virginia" in the form of allegedly increased costs for public services relating to law enforcement, health care, court and prosecutorial resources, and jail and prison resources (See Ex. A at ¶¶45, 51].

No specific damages are demanded in Count V, the cause of action entitled "Negligence." Since Count V is based on "all preceding paragraphs" in the Second Amended Complaint, it is entirely unclear what damages the State of West Virginia was seeking on the basis of such alleged negligence.  (See Ex. A at ¶¶54-63.)

Finally, the claim for unjust enrichment under Count VI also fails to state a covered claim for damages because of "bodily injury".  (See Ex. A at ¶¶64-68).  The return of money unjustly obtained does not constitute an insurable loss under the Cincinnati Policies.  See e.g. *Continental Cas. Co. v. Duckson*, 826 F.Supp.2d 1086, 1096-7 (N.D.Ill. 2011); *St. Paul Mercury Ins. Co. v. Foster*, 268 F.Supp.2d 1035, 1044 (C.D.Ill. 2003); *Local 705 Int'l Bhd. of Teamsters Health & Welfare Fund v. Five Star Managers, L.L.C.*, 735 N.E.2d 679, 684 (Ill.App.Ct. 2000).

Each of these claims and all alleged damages remained at issue at the time that H.D. Smith settled the Underlying Lawsuit.  (See Ex. E, Hayes deposition at p. 13, ln 17 to p. 14, ln 4).  Less than a month before the settlement, H.D. Smith counsel stated that she "no idea what damages" were being claimed or how the State of West Virginia would prove its claims.  (See

31

Ex. H, a copy of a July 29, 2016 email from H.D. Smith counsel to counsel for the State of West Virginia). The fact that H.D. Smith offered $2,000,000 in that same email despite such claim belies the fact that any particular claim or type of damages was the primary focus of the settlement. (*Id*.). It is just as likely, if not more likely that H.D. Smith settled to avoid the possible imposition of millions of dollars in fines resulting from the "thousands of wrongful acts" allegedly at issue, including H.D. Smith's "12,400 transactions" to a pill mill pharmacy in Mingo County, West Virginia. (See Ex. A at pp. 2-3). While the State of West Virginia might not be able to tie H.D. Smith to injury to any individual citizen, the State of West Virginia did have information regarding H.D. Smith's allegedly excessive distribution of controlled substances on which it might seek the assessment of fines or penalties.

For the reasons stated above, there is no coverage under the Cincinnati Policies because any "bodily injury" caused by H.D. Smith could reasonably be expected to have resulted from the acts alleged by the State of West Virginia. However, should the Court determine that some portion of the "bodily injury" damages allegedly caused by H.D. Smith would have been covered under the Cincinnati Policies, based on the record and on H.D. Smith's own statements, it cannot demonstrate that it had a reasonable anticipation of liability for such damage or that such damages were "a primary focus of the litigation" and, therefore, Cincinnati is not required to pay for H.D. Smith's settlement of covered and uncovered claims.

### C. Cincinnati is Entitled to Summary Judgment on H.D. Smith's Claim Under Section 155 of the Insurance Code

Section 155 of the Insurance Code provides:

> (1)  In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part

of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $60,000;

(c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

*    *    *

*See* 215 ILCS 5/155 (West 2018).

A trial court must consider the totality of the circumstances before it determines that an insurer's conduct violates section 155. *See Golden Rule Ins. Co. v. Schwartz*, 786 N.E.2d 1010, 1018 (Ill. 2003). If there is a bona fide dispute about coverage, delay in settling a claim may not violate the statute. *Id.*. An insurer's actions are not vexation and unreasonable if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law. *See TKK USA, Inc. v. Safety Nat'l Cas. Corp.*, 727 F.3d 782, 793 (7th Cir. 2013). A bona fide dispute in one that is real, genuine and not feigned. *See West Wind Express v. Occidental Fire & Cas. Co. of N. Carolina*, 2015 WL 5544255 (N.D. Ill., No. 10-cv-6263, Sept. 18, 2015). If there is a finding of no duty to indemnify, then there can be no violation of section 155. *See, e.g., Arthur Anderson LLP v. Federal Ins. Co.*, 2007 WL 844632, *18-19 (N.D. Ill., No. 06 C 1824, Mar. 16, 2007) (if breach of contract and declaratory judgment claims fail, then insured cannot maintain stand-alone section 155 claim); *Lolling v. Cincinnati Ins. Co.*, 2015 WL

12670498, *5-6 (C.D. Ill., No. 13-cv-3352, Mar. 4, 2015 (insurer entitled to summary judgment on section 155 violations when there is no evidence to support finding that insurer breached terms of policy).  Neither the length of time, the amount of money involved, nor any other single factor taken by itself is dispositive. *Green v. International Insurance Co.*, 605 N.E.2d 1125, 1129 (Ill.App.Ct. 1992).  Moreover, section 155 fees and penalties are not awarded simply because the insurer refuses to settle or was unsuccessful in litigation. *Deverman v. Country Mutual Insurance Co.*, 371 N.E.2d 1147, 1148-49 (Ill.App.Ct. 1977). Rather, "[i]t is the attitude of the defendant which must be examined." *Norman v. American National Fire Insurance Co.*, 555 N.E.2d 1087, 1110 (Ill.App.Ct. 1990).

> In Count IV of its Amended Counterclaim, H.D. Smith alleges:

> > CIC's failure and refusal to pay the reasonable amount necessary to settle the potentially covered claims asserted in the West Virginia Complaint is vexatious and unreasonable, in violation of 215 ILCS 5/155.

[Doc. 52 at ¶ 34]. The Court should grant Cincinnati's summary judgment motion on the issue of violation of section 155. Cincinnati complied with Illinois law when it filed the instant declaratory judgment action. Also, H.D. Smith cannot establish that Cincinnati acted vexatiously or unreasonably at any time because there is a bona fide dispute as to whether Cincinnati has a duty to indemnify H.D. Smith for the underlying settlement. H.D. Smith took no discovery on the issue, did not depose any Cincinnati personnel, and did not disclose any experts on the issue of Cincinnati's alleged violation of section 155.  H.D. Smith never involved Cincinnati in its settlement negotiations with the underlying plaintiff, nor to date has it provided Cincinnati any information supporting the position that any part of the settlement involved damages covered by the Cincinnati Policies. Therefore, as explained below, the Court should grant summary judgment in Cincinnati's favor on H.D. Smith's section 155 claim.

### 1.      Cincinnati Complied with Illinois Law when it Filed the Instant Declaratory Judgment Action

Cincinnati cannot be found to have acted vexatiously or unreasonably when it complied with Illinois law by filing the instant declaratory judgment action to resolve outstanding coverage issues. Under Illinois law, an insurer which takes the position that a complaint does not present covered damages under a policy that includes a duty to defend may not simply refuse to defend the insured. *See Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122, 1134-35 (Ill. 1999). Rather, the insurer has two options: (1) defend the suit under a reservation of rights; or (2) seek a declaratory judgment that there is no coverage. *Id.*. If the insurer fails to take either of these steps and is later found to have wrongfully denied coverage, the insurer is estopped from raising policy defenses to coverage. *Id.* (citations omitted).

Cincinnati promptly took the second of the two options available to it under *Ehlco* when it learned of the Underlying Lawsuit. H.D. Smith cannot now assert that Cincinnati violated section 155 when Cincinnati acted in full compliance with Illinois law.

### 2.      There is a Bona Fide Dispute Concerning Whether Cincinnati Must Indemnify H.D. Smith for the Settlement at Issue

Cincinnati cannot be held to have violated section 155 because there is a bona fide dispute with respect to whether Cincinnati owes H.D. Smith a duty to indemnify it for the settlement of the underlying suit. As set forth above, if there is a bona fide dispute about coverage, delay in settling a claim may not violate the statute. *See Golden Rule*, 786 N.E.2d at 1018. *See also MGN Logistics, Inc. v. Travelers Prop. & Cas. Co. of America, et al*., 2017 WL 3780280 (N.D. Ill., No. 16-cv-4301, Aug. 31, 2017) (citing *Golden Rule*, holding that insurer's conduct was not vexatious under section 155 when insurer's arguments found "some" support in policy documents); *West Wind Express v. Occidental Fir & Cas. Co. of N. Carolina*, 2015 WL

35

5544255 (N.D. Ill., No. 10-cv-6263, Sept. 18, 2015) (citing *Golden Rule*, granting insurer's summary judgment motion on section 155 when the Seventh Circuit resolved the coverage issue merely two months before insured filed suit against insurer, and when regardless there is a circuit split on the issue).

Here, there is a bona fide dispute as to whether Cincinnati owes a duty to indemnify H.D. Smith for the settlement of the Underlying Lawsuit. The dispute concerns whether the now-settled claims were covered under the Cincinnati and, since the settlement occurred prior to trial and without Cincinnati's involvement, whether Cincinnati must pay for that settlement. H.D. Smith itself acknowledges that some claims might be covered while others might not. (See Ex. E, Hayes deposition at p. 10, ln 8 to p. 13, ln 16). Moreover, even if some of the claims in the Underlying Lawsuit did pose liability for damages covered under the Cincinnati Policies, that alone does not mean that Cincinnati has a duty to indemnify H.D. Smith. As shown above, under Illinois law, H.D. Smith has the burden to show that the settlement of the Underlying Lawsuit settled a covered loss in reasonable anticipation of liability and also that the covered claims were "a primary focus of the litigation."

Further evidence of a bona fide dispute in found in the fact that this Court ruled, though that ruling was ultimately reversed by the Seventh Circuit, that Cincinnati did not have a duty to defend H.D. Smith in the underlying suit. Much like in *Golden Rule*, a reviewing court's reversal of a lower court's ruling on a coverage issue offers support of a bona fide dispute on that coverage issue. Finally, the fact that insurers' coverage obligations with respect to the Underlying Lawsuit have been litigated with varying results in several courts across the country also demonstrates that Cincinnati has raised a bona fide dispute. See e.g. *Cincinnati Insurance Co. v. Richie Enterprises LLC* (Case No. 1:12-cv-00186 in the U.S. District Court for the

Western District of Kentucky); *Liberty Mutual Fire Ins. Co. v. JM Smith Corp.* (Case No. 7:12-cv-02824 in the U.S. District Court for the District of South Carolina); *Cincinnati Ins. Co. v. Amerisourcebergen Drug Corp., et al.* (Case No. CV 2012-10-3912 in the Common Pleas Court of Butler County, Ohio); *The Travelers Property Casualty Company of America v. Anda, Inc.* (Case No. 2-cv-62392 in the U.S. District Court for the Southern District of Florida).

H.D. Smith's behavior undermines its allegations of vexatious or unreasonable conduct on the part of Cincinnati. H.S. Smith did not involve Cincinnati in its settlement negotiations with the State of West Virginia. (See Ex. E, Hayes deposition at p. 44, ln 1-20 ; Ex. N). Furthermore, H.D. Smith failed to provide Cincinnati any information supporting the position that the settlement was for a potentially covered claim. (See Ex. K; L; N; O). H.D. Smith cannot claim that Cincinnati's failure to pay the settlement is vexatious or unreasonable when H.D. Smith's own actions call insurance coverage into question.

## IV.   CONCLUSION

This Court should conclude, upon consideration of the actual allegations and relief sought in the Underlying Lawsuit, that H.D. Smith cannot establish that that it settled an otherwise covered loss in reasonable anticipation of liability or that such covered damages or claims, if there were any, were a primary focus of the litigation.  Therefore, this Court should award summary judgment to Cincinnati in relation to H.D. Smith's counterclaims for declaratory judgment and breach of contract and issue a declaration that Cincinnati is not required to pay for H.D. Smith's settlement.  Further, because Cincinnati did not owe indemnity to H.D. Smith in relation to its settlement and/or because the issue of coverage for such settlement presented a bone fide coverage issue, this Court should award summary judgment to Cincinnati on H.D. Smith's counterclaim for damages under 215 ILCS 5/155.

Dated:  January 31, 2018                    Respectfully submitted,

                                  By:        s/      Brian M. Reid
                                        Attorneys for Cincinnati Insurance Company

                                        Brian M. Reid, Esq.
                                        Nicholas D. Butovich, Esq.
                                        LITCHFIELD CAVO LLP
                                        303 W. Madison Street, Suite 300
                                        Chicago, Illinois 60606
                                        (312) 781-6617 (Reid)
                                        (312) 781-6573 (Butovich)
                                        Email:  reid@litchfieldcavo.com
                                        Email:  butovich@litchfieldcavo.com

## **Local Rule 7.1(B)(4)(c) Word Count Certificate of Compliance**

I, Brian M. Reid, hereby certify pursuant to Local Rule 7.1(B)(4)(c) that Cincinnati's Memorandum of Law in Support of its Motion for Summary Judgment conforms to the requirements of Local Rules 7.1(B)(4) and 7.1(D)(5). This Brief was prepared using Microsoft Word and was produced using 12-point font.  The length of the "Argument" section of the Brief is 6,887 words and 42,266 characters. The word count of the word processing system has been applied specifically to include all text, including headings, footnotes and quotations.

Respectfully submitted:

By: _____/s/_____Brian M. Reid_____
   Attorney for Cincinnati Insurance Company

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 31, 2018, I electronically filed the foregoing **CINCINNATI INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Christian P. Jones
> Barnes & Thornburg LLP
> 11 South Meridian Street
> Indianapolis, Indiana 46204
> 317-236-1313
> 317-231-7433 Facsimile
> christian.jones@btlaw.com

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participant:

> None.

> By:      s/      Brian M. Reid
> Attorneys for Cincinnati Insurance Company

> Brian M. Reid, Esq.
> Nicholas D. Butovich, Esq.
> LITCHFIELD CAVO LLP
> 303 W. Madison Street, Suite 300
> Chicago, Illinois 60606
> (312) 781-6617 (Reid)
> (312) 781-6573 (Butovich)
> Email:  reid@litchfieldcavo.com
> Email:  butovich@litchfieldcavo.com