IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

CINCINNATI INSURANCE COMPANY,     )
                                                 )
    Plaintiff and Counterclaim Defendant,    )
                                                 )
 v.                                  )        Case No. 12-3289
                                               )
H.D. SMITH WHOLESALE DRUG COMPANY, )
n/k/a H.D. SMITH, L.L.C.,               )
                                               )
    Defendant and Counterclaim Plaintiff.    )

OPINION

RICHARD MILLS, United States District Judge:

This is an insurance coverage dispute which at this stage concerns whether Cincinnati Insurance Company has an obligation to indemnify H.D. Smith for a $3.5 million settlement it entered into in an underlying lawsuit.

Both parties have filed motions for summary judgment.

## I.     INTRODUCTION

Plaintiff and Counterclaim Defendant Cincinnati Insurance Company ("Cincinnati") filed this action, seeking a declaration regarding insurance coverage sought by Defendant and Counterclaim Plaintiff H.D. Smith Wholesale Drug Company n/k/a H.D. Smith, L.L.C., in connection with an underlying lawsuit brought against it by the State of West Virginia ex rel. Darrell V. McGraw, Attorney

1

General ("the underlying lawsuit" or "West Virginia lawsuit"). The underlying lawsuit, styled as *State of West Virginia v. Amerisourcebergen Drug Corporation et al.*, Civil Action No. 12-C-141, was originally filed in June 2012 in the Circuit Court of Boone County, West Virginia.

The current phase of the litigation involves what H.D. Smith claims is Cincinnati's obligation to indemnify H.D. Smith for a $3.5 million settlement it entered into in the underlying lawsuit. Cincinnati denies that it owes coverage to H.D. Smith for its settlement of the underlying lawsuit, denies that it breached any obligations to H.D. Smith in connection with the underlying lawsuit, and denies that it acted unreasonably at any time or that it is liable in any way for damages under 215 ILCS 5/155.

## II.    FACTUAL BACKGROUND

### A. Cincinnati policies

Cincinnati issued to H.D. Smith one-year insurance policies each year with effective dates of January 15, 2001 through January 15, 2018, providing commercial general liability coverage and commercial umbrella coverage. H.D. Smith's motion concerns the policies effective from 2005-2013.

The primary policies provide in part: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Pursuant to the primary policies,

"[d]amages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury.'" Cincinnati may investigate any "occurrence." The Cincinnati umbrella policies also require Cincinnati to pay on behalf of H.D. Smith the "'ultimate net loss' which the insured is legally obligated to pay as damages for 'bodily injury'" that exceeds the limits of the underlying Cincinnati Primary Policies.

The Cincinnati Primary Policies define "bodily injury" as follows: "'Bodily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." "Damages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury.'"

The Cincinnati Umbrella Policies define "bodily injury" as follows: "'Bodily injury' means bodily harm or injury, sickness, disease, disability, humiliation, shock, fright, mental anguish or mental injury, including care, loss of services or death resulting from any of these at any time."

"Occurrence" is defined in the Cincinnati Primary Policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Occurrence" is defined in the Cincinnati Umbrella Policies in pertinent part as: "an accident including continuous or repeated exposure to

substantially the same general harmful conditions, that results in 'bodily injury' or 'property damage.'"

The Cincinnati Primary Policies and Cincinnati Umbrella Policies contain the following, or substantively similar, exclusion regarding "Expected and Intended injury":

> Expected or Intended Injury
>
> "Bodily injury" or property damage" which may reasonably be expected to result from the intentional or criminal acts of the insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually expected or intended. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

B. Underlying lawsuit and Cincinnati's refusal to defend

On June 26, 2012, the Attorney General of West Virginia and two state agencies commenced the underlying lawsuit. On January 2, 2014, an amended complaint was filed wherein twelve defendants were named, including H.D. Smith. On January 13, 2015, the underlying plaintiffs served a second amended complaint. The second amended complaint remained under seal until May 2016.

The underlying lawsuit alleged that H.D. Smith distributed pharmaceutical products to pharmacies in West Virginia. The time period of the sales that were the focus of the underlying lawsuit was 2007 through 2012.

In the second amended complaint, the State of West Virginia alleged there were "literally thousands of wrongful acts" which would be litigated in that case,

citing as an example H.D. Smith's "12,400 transactions" to a pill mill pharmacy in Mingo County, West Virginia. The second amended complaint included specific allegations regarding H.D. Smith's distribution of controlled substances to the State of West Virginia. According to Cincinnati, West Virginia alleged that the sheer volume of tablets or pills shipped by H.D. Smith demonstrated the suspicious nature of the distributions and represented a gross violation of H.D. Smith's legal duty to not distribute controlled substances for non-legitimate purposes.

The second amended complaint listed the following six causes of action against each of the defendants, including H.D. Smith:

- Count I—Injunctive Relief for Violations of Responsibilities and Duties Under the West Virginia Uniform Controlled Substances Act
- Count II—Damages Resulting from Negligence and Violations of the West Virginia Uniform Controlled Substances Act
- Count III—Violation of the West Virginia Consumer Credit and Protection Act (WVCCPA) Unfair Methods of Competition or Unfair Or Deceptive Acts or Practices
- Count IV—Public Nuisance
- Count V—Negligence
- Count VI—Unjust Enrichment

In Count I, H.D. Smith's alleged liability is based on allegations that "[d]efendants have willfully and repeatedly violated the Uniform Controlled Substances Act and corresponding regulations." The only relief sought was injunctive relief restraining H.D. Smith from continuing to violate the West Virginia Uniform Controlled Substances Act.

In Count II, the State of West Virginia sought damages from H.D. Smith based on "repeated violations." It alleges conspiratorial conduct of the West Virginia Uniform Controlled Substances Act through:

a. Improper dispensing of prescriptions contrary to W.Va. Code § 60A-3-308
b. Engaging in prohibited acts contrary to W.Va. Code §§ 60A-4-401 through 403
c. Deceiving and attempting to deceive medical practitioners in contravention of W.Va. Code § 60A-4-410
d. Disregarding the requirements of the Wholesale Drug Distribution Licensing Act of 1991, W.Va. Code § 60A-8-1 *et seq.*
e. Conspiring to violate the West Virginia Uniform Controlled Substances Act

West Virginia alleged H.D. Smith "willfully turned a blind eye" by regularly distributing large quantities of commonly-abused controlled substances to clients serving customers who could reasonably be expected to become addicted to drugs or to engage in illicit drug transactions.

In Count III, the State of West Virginia sought damages from H.D. Smith based on violation of the West Virginia Consumer Credit and Protection Act, unfair methods of competition or unfair or deceptive acts or practices. It was alleged that H.D. Smith violated West Virginia regulations guarding against theft and diversion. The State of West Virginia alleged H.D. Smith's "repeated violations were and are willful, and the State seeks civil penalties under W. Va. Code § 46A-7-111(2) for each violation."

In Count IV, the State of West Virginia sought damages from H.D. Smith based on the alleged creation of a public nuisance by failing to put effective controls and procedures in place to guard against theft and diversion of controlled substances; failure to design and operate a system to disclose suspicious orders of controlled substances; failure to inform the State of suspicious orders when discovered. The State of West Virginia alleged that defendants, including H.D. Smith, "knew or should have known their conduct would cause hurt or inconvenience to the State of West Virginia." The defendants, including H.D. Smith, "negligently, intentionally and/or unreasonably interfered with the right of West Virginians to be free from unwarranted injuries, addictions, diseases, and sicknesses." The State of West Virginia alleged that defendants, including H.D. Smith, "were on notice that an epidemic from prescription drug abuse existed." The defendants, including H.D. Smith, "knew or should have known that these substances were not being prescribed and consumed for legitimate medical purposes." The State of West Virginia listed a number of public nuisances due to the problem, which resulted in economic harm due to the "expenditure of massive sums of monies."

In Count V, the State of West Virginia sought damages from H.D. Smith based on its alleged conduct in the distribution of controlled substances and the failure to monitor and guard against third-party misconduct, causing West Virginia to incur costs related to diagnosis, treatment and cure of addiction or the risk of addiction.

In Count VI, the State of West Virginia sought damages from H.D. Smith based on allegations that it has been unjustly enriched because the State of West Virginia has incurred costs for law enforcement, legal and judicial resources and services, correctional resources and services, public welfare and service agencies, healthcare and medical services, drug abuse education, and lost revenue and costs from workplace accidents and employee absenteeism.

After Cincinnati received notice of the underlying lawsuit, Cincinnati initiated this lawsuit and disclaimed any coverage obligations. Cincinnati refused to defend H.D. Smith and filed this action seeking a declaration that it owed no defense or coverage obligations in connection with the underlying lawsuit.

H.D. Smith asserted a counterclaim against Cincinnati seeking a declaration that Cincinnati must defend and indemnify H.D. Smith and asserting a claim for breach of contract for Cincinnati's refusal to defend the underlying lawsuit.

In April 2015, H.D. Smith moved in the underlying case to dismiss the second amended complaint on a number of grounds, arguing that the State of West Virginia had failed to "plead Defendant-specific causation and Defendant-specific damages":

> Plaintiffs fail to satisfy this Court's requirement that they allege Defendant-specific facts because they do not allege that any H.D. Smith-supplied controlled substances dispensed to any person resulting in that person's arrest, prosecution, conviction, and incarceration. Plaintiffs do not allege that they have supplied treatment or rehabilitation services to any such person. Plaintiffs still allege nothing that would suggest H.D. Smith's liability to them, nor do they allege anything to separate H.D. Smith's allegedly causative conduct from the causative conduct of those who supplied,

ingested, and abused controlled substances flooding into the State from out-of-State sources.

H.D. Smith further argued that "no amount of discovery from H.D. Smith can supply facts sufficient to plead the still-missing elements of causation and damages. Only these Plaintiffs can know what damages they allegedly incurred, and how – or even if – any controlled substance supplied pursuant to a "suspicious" order was dispensed to a person who then abused or diverted them in a way to cause these Plaintiffs any discernable damage."

In its September 8, 2015 order, though finding the second amended complaint would "survive the collective Defendants' Motions to Dismiss," the court stated that "if the Defendants raise the same arguments in a motion for summary judgment after discovery is completed, an entirely different result might be reached, once the summary judgment standard is applied with the allegations and the facts that are uncovered in discovery."

In its October 2015 answer and affirmative defenses to the second amended complaint, H.D. Smith denied all allegations and asserted a number of affirmative defenses. The tenth affirmative defense states that plaintiffs have suffered no damages. The twenty-first affirmative defense provides it is impossible to ascertain and allocate the alleged damages. The twenty-sixth affirmative defense states that plaintiffs have not and will not suffer an injury to a legally protected or cognizable

interest due to H.D. Smith's conduct. H.D. Smith maintained such defenses and positions up until it settled the underlying lawsuit.

On July 19, 2016, the United States Court of Appeals for the Seventh Circuit ruled that Cincinnati had a duty to defend H.D. Smith in connection with the underlying lawsuit. That court stated the underlying lawsuit presented potential liability for H.D. Smith in relation to damages because of "bodily injury" incurred by the State of West Virginia in relation to hospital services and costs related to the diagnosis, treatment and cure of addiction. *Cincinnati Ins. Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771, 774-75 (7th Cir. 2016).

The Seventh Circuit stated "West Virginia alleged that its citizens suffered bodily injuries and the state spent money caring for those injuries—money that the state seeks in damages. On its face, West Virginia's suit appears to be covered by Cincinnati's policy." *Id*. at 774. That court further stated, "To be sure, West Virginia asserts numerous legal theories and seeks a variety of remedies" and found that the duty to defend arose "even if only one of several theories is within the potential coverage of the policy." *Id*. at 775.

On August 31, 2016, following the Seventh Circuit's mandate, this Court entered an Order granting partial summary judgment and ruling that Cincinnati had a duty to defend H.D. Smith in connection with the underlying lawsuit under the policies issued from 2005 to 2013.

After the underlying case had settled and Cincinnati refused to indemnify H.D. Smith for that settlement, H.D. Smith filed its amended counterclaim for declaratory relief and damages on February 23, 2017, which included a claim for damages under 215 ILCS 5/115 based on Cincinnati's failure to pay for H.D. Smith's settlement of the underlying lawsuit. Cincinnati denied any liability for damages, including damages under 215 ILCS 5/115.

C. <u>Cincinnati's refusal to indemnify H.D. Smith in underlying lawsuit</u>

In the underlying lawsuit, H.D. Smith raised numerous legal defenses to the underlying plaintiffs' claims that it believed were meritorious. H.D. Smith filed two motions to dismiss which raised various legal issues. The trial court denied both of the motions.

H.D. Smith and the other West Virginia defendants sought appellate review of the trial court's denial of these motions by filing a petition for writ of prohibition with the Supreme Court of Appeals of West Virginia. The court denied the petition by a 3-2 vote in January 2016.

During the last several years that H.D. Smith was a party to the underlying lawsuit, it engaged in substantial discovery and motion practice. H.D. Smith claims that the remaining litigation option for it and the other defendants was to proceed with a lengthy, risky and complex trial scheduled to begin in January 2017 in a jurisdiction at the forefront of the prescription pain pill/heroin epidemic. Cincinnati

notes that H.D. Smith could have proceeded with discovery and sought summary judgment.

Between January 2016 and July 2016, multiple Defendants in the underlying lawsuit settled with the plaintiffs. H.D. Smith would be one of only two remaining defendants left in the case when it proceeded to trial. This narrowed field of defendants increased H.D. Smith's exposure at a potential trial. Additionally, United States Senator Joe Manchin, who is also a former two-term Governor of West Virginia, intended to testify at trial on behalf of the plaintiffs and was expected to give testimony highly adverse to any remaining defendants.

In June 2016, H.D. Smith's defense counsel estimated that H.D. Smith would incur an additional $2.4 million in legal fees through trial and verdict. This did not include fees for post-trial motions or appeal. A trial was expected to last at least one month.

H.D. Smith alleges that, at the time of this estimate, the Seventh Circuit had not yet issued any decision regarding Cincinnati's duty to defend and Cincinnati previously had declined to participate substantively in any settlement discussions regarding the underlying lawsuit. Cincinnati contends that it was not involved in or informed of H.D. Smith's settlement discussions between April 2016 and October 2016, learning of the settlement only after it occurred. H.D. Smith's other insurer,

XL Insurance, did not participate substantively in settlement discussions regarding the underlying lawsuit.

Cincinnati states that, following the Seventh Circuit's opinion on July 19, 2016, Cincinnati was required to pay for H.D. Smith's defense in relation to the underlying lawsuit. H.D. Smith claims that when it made the decision to settle, it had no assurance of any insurance coverage from any insurance carrier. Moreover H.D. Smith states that, even after the mandate issued, it was possible that Cincinnati might try to dispute in some manner its obligations to pay all defense costs H.D. Smith had incurred.

In a July 29, 2016 communication from H.D. Smith's counsel to counsel for the State of West Virginia, H.D. Smith offered $2,000,000 despite counsel's statement that "five months from trial," she had "no idea what damages plaintiffs are claiming against my client or how they are proving those claims." In that communication, counsel for H.D. Smith reiterated her request for damages information. It was H.D. Smith's position that, as of that July 29, 2016 communication, the State of West Virginia had not provided damages information to anyone in the case.

Cincinnati claims that, as reflected in emails of August 19, 2016 between H.D. Smith and its counsel, H.D. Smith's settlement position was influenced by "reputational ramifications" and considerations that up to half of the settlement

proceeds be earmarked for the "Fight Substance Abuse Fund," a fund created by a West Virginia statute in relation to the State's substance abuse issues. H.D. Smith contends this is an incomplete and inaccurate characterization of the contents of the cited emails, which speak for themselves. Moreover, although the parties discussed earmarking settlement funds for a "Fight Substance Abuse Fund," that ultimately was not part of any actual settlement agreement.

After protracted negotiations with the West Virginia plaintiffs that lasted several months, H.D. Smith was able to reach an agreement in-principle on or about August 22, 2016 to settle for $3.5 million, significantly less than the plaintiffs' initial demand of $12 million.

H.D. Smith states it concluded that if the case were to be litigated through trial, post-trial proceedings and appeal, defense costs could have approached or exceeded $3.5 million. Cincinnati claims that, by the time H.D. Smith reached an agreement in principle to settle, it was already aware of the Seventh Circuit's ruling that Cincinnati had a duty to defend H.D. Smith and, therefore, the burden for defense and trial costs, if necessary, would be Cincinnati's burden. H.D. Smith contends Cincinnati had not yet advised it of any commitment to reimburse H.D. Smith's defense costs or to pay defense costs on a going-forward basis. H.D. Smith further asserts there existed a possibility that Cincinnati might try to dispute in some manner its obligation to pay all defense costs H.D. Smith had incurred.

Before H.D. Smith reached an agreement-in-principle to settle the West Virginia lawsuit, it had obtained information about the amounts other defendants had agreed to pay to settle the claims against them. Those amounts were as follows:

| | | |
|---|---|---|
| Keysource Medical Inc. | $ | 250,000 |
| Quest Pharmaceuticals, Inc. | | 250,000 |
| J.M. Smith Corporation d/b/a Smith Drug Company | | 400,000 |
| Associated Pharmacies, Inc. | | 850,000 |
| The Harvard Drug Group, LLC | | 1,000,000 |
| Anda Inc. | | 1,865,250 |
| Miami-Luken, Inc. | | 2,500,000 |

To place these settlement amounts in context, the West Virginia plaintiffs conducted settlement negotiations by focusing on the volume of each defendants' sales into the State of West Virginia and making settlement demands based on those amounts. H.D. Smith's aggregated sales of hydrocodone and oxycodone in West Virginia for the 2007 to 2012 period was comparable, though slightly less in total units sold, to the company settling for $1.865 million. H.D. Smith sold significantly more units of hydrocodone and oxycodone than the companies settling for $1 million and $850,000—even combining the total units of those two companies.

After H.D. Smith completed its settlement, it learned that the last remaining defendant in the underlying lawsuit settled for a payment of $16 million. Therefore, all defendants in the West Virginia case ended up settling the case before trial.

After this Court entered it partial summary judgment order regarding Cincinnati's duty to defend, H.D. Smith informed Cincinnati that it had reached an

agreement-in-principle that would provide H.D. Smith with a full release of claims by the West Virginia plaintiffs in exchange for a payment of $3.5 million by H.D. Smith, with H.D. Smith making no admission whatsoever of any liability, misconduct or fault. H.D. Smith requested that Cincinnati commit to paying the settlement amount on H.D. Smith's behalf once the settlement was consummated. However, Cincinnati did not agree to do this. H.D. Smith informed Cincinnati it was likely that any final settlement agreement would include a provision requiring payment of the settlement funds within 30 days and, therefore, time was of the essence.

Cincinnati states it was not involved in or informed of H.D. Smith's settlement discussions of July and August 2016, learning of the settlement only after it occurred. H.D. Smith contends Cincinnati was advised of a potential settlement after an agreement in principle had been reached, but before any settlement agreement was finalized. Negotiations were ongoing and not finalized until December 2016. An October 24, 2016 letter and other communications explained the ongoing settlement negotiations and requested contribution to the settlement amount. H.D. Smith's counsel believed settlement was reasonable based on the anticipated costs of preparing for trial which had been estimated at $2.4 million, more than $1,000,000 less than the amount that H.D. Smith agreed to pay. H.D. Smith's counsel stated the settlement was reasonable and was based on a comparison of H.D. Smith's "market

share" in comparison to other settling parties.  The purpose of the October 24, 2016 letter was "to convey the settlement that was reached from a dollar perspective and the reason behind it to Cincinnati."  Cincinnati notes that in the October 24 letter, H.D. Smith continued to dispute all liability, misconduct or fault in relation to the claims and damages at issue in the underlying lawsuit.

Cincinnati states that the burden for defense costs for the underlying lawsuit would have been Cincinnati's burden following the Seventh Circuit's decision.  H.D. Smith claims it had no assurance that Cincinnati would reimburse its defense costs or pay defense costs on a going-forward basis.

Cincinnati further claims that, though used as a justification for settlement in the October 24, 2016 letter from counsel, H.D. Smith's actual position is that "market share data had nothing to do with any potential liability in the State of West Virginia."  H.D. Smith alleges the assertion is incomplete and mischaracterizes its position.

In a letter dated December 15, 2016, H.D. Smith informed Cincinnati that H.D. Smith and the West Virginia plaintiffs had reached final agreement on the terms of a settlement and release agreement, with the sole remaining open term being the time within which H.D. Smith will be required to make the settlement payment, and H.D. Smith attached a copy of that agreement to the letter.  H.D. Smith demanded that Cincinnati pay the amount of the settlement consistent with the terms of its

policies, which H.D. Smith claims is also consistent with this Court's ruling that Cincinnati had a duty to defend. Cincinnati states that H.D. Smith provided no additional support for its position. Cincinnati also disputes H.D. Smith's statement that this Court's ruling on the duty to defend was determinative of Cincinnati's obligation to pay for H.D. Smith's settlement.

On or about December 28, 2016, H.D. Smith entered into an agreement with the West Virginia plaintiffs, settling all claims asserted against H.D. Smith in the underlying action. H.D. Smith paid the $3.5 million settlement amount on or about February 3, 2017.

H.D. Smith states it had no assurance at the time it reached an agreement to settle the underlying lawsuit and paid the settlement amount that any insurer would willingly pay or contribute to a settlement. Cincinnati disputes that H.D. Smith's alleged lack of assurances are of Cincinnati's doing. Cincinnati further claims H.D. Smith did not involve Cincinnati in the settlement discussions leading to its settlement-in-principle of the underlying lawsuit or, at any time, provide Cincinnati with information supporting a determination that the settlement was based on reasonable anticipation of its own liability for damages covered by the pertinent insurance policies issued by Cincinnati or that such covered claims, if any, were "a primary focus of the litigation" in accord with the applicable case law.

By letter dated January 13, 2017, Cincinnati provided its position in response to H.D. Smith's demand that Cincinnati pay the entire settlement on behalf of H.D. Smith, noting that coverage for some or all of the claims at issue was still in dispute; that H.D. Smith had not through discovery or otherwise provided Cincinnati with information supporting H.D. Smith's contention that the amount it has agreed to pay to settle the underlying lawsuit related, in whole or in part, to covered damages; and that H.D. Smith had not involved Cincinnati in the negotiation of the settlement and, therefore, Cincinnati was not provided with information during that process regarding the nature and extent of H.D. Smith's alleged liability.

By letter dated January 26, 2017, counsel for H.D. Smith responded to Cincinnati's January 13, 2017 letter. Cincinnati contends that letter provided none of the additional information requested by Cincinnati and instead stated that the October 24, 2016 letter "provided detailed information" about the terms of the settlement and the reasons why H.D. Smith decided to settle. H.D. Smith contends the January 27, 2016 letter and previous letters provided extensive information about the settlement and outlined numerous reasons explaining why the proposed settlement was reasonable.

H.D. Smith alleges Cincinnati has failed and refused to provide coverage for the settlement, in breach of its duty to defend and in breach of its obligations under the policies. Cincinnati disputes that its refusal to pay the entirety of H.D. Smith's

settlement is in any way a breach of its duty to defend or of any other obligation allegedly owed H.D. Smith based on H.D. Smith's failure to involve Cincinnati in the settlement discussions leading to its settlement-in-principle of the underlying lawsuit or, at any time, to provide Cincinnati with information supporting a determination that the settlement was based on reasonable anticipation of its own liability for damages covered by the pertinent insurance policies issued by Cincinnati or that such covered claims, if any, were a primary focus of the litigation.

All six causes of action stated in the second amended complaint were still at issue when H.D. Smith settled the underlying lawsuit. Until the date that H.D. Smith settled the underlying lawsuit, H.D. Smith disputed liability with respect to all causes of action stated in the second amended complaint.

Cincinnati claims that Joy Hayes, H.D. Smith's corporate representative, testified that there might not be coverage for many of the claims or damages sought from it in the second amended complaint, including Counts I, II and III. H.D. Smith notes that it timely objected to the questions that elicited the cited testimony as calling for impermissible legal conclusions. Moreover, Ms. Hayes later testified that to the extent a judgment on any of the counts in the second amended complaint was premised on a finding of negligence, H.D. Smith contended that a judgment on that count would be covered by the Cincinnati policies.

The stated basis for H.D. Smith's assertion in Count IV of its counterclaim under 215 ILCS 5/115 is Cincinnati's "failure and refusal to pay the reasonable amount necessary to settle the potentially covered claims asserted in the West Virginia Complaint is vexatious and unreasonable."

H.D. Smith contends that, as of the February 24, 2017 filing of its counterclaim against Cincinnati under 215 ILCS 5/115, it had provided Cincinnati an explanation as to why it had settled.

Cincinnati claims that, on March 13, 2017, more than six months after H.D. Smith had agreed to settle and more than nine months after it had been unsealed in the underlying lawsuit, H.D. Smith provided Cincinnati for the first time with a copy of the January 2015 amended complaint filed in the underlying lawsuit, the complaint that contained the H.D. Smith-specific allegations required by the West Virginia court and that was in place and forming the basis of H.D. Smith's settlement discussions. H.D. Smith alleges the only change made to that second amended complaint was to add paragraphs specifying the volume and type of prescription drugs sold by each defendant in the underlying lawsuit. The other facts and legal claims remained the same.

Due to the phasing of discovery before the Court in this coverage action, H.D. Smith limited its initial discovery responses solely to information and issues which it felt related to Cincinnati's duty to defend. H.D. Smith states that it provided

Cincinnati with all information that was required to assess the underlying settlement outside of the discovery process that occurred in this lawsuit.

In April and May 2017, more than seven months after it had agreed to settle the underlying lawsuit, H.D. Smith provided Cincinnati for the first time with a supplemental production of materials related to the underlying lawsuit, including copies of pleadings and written discovery responses, copies of the document productions by H.D. Smith and the State of West Virginia and copies of deposition transcripts for depositions taken in the underlying lawsuit. H.D. Smith states this additional production of documents was made in accordance with deadlines established by the Court and by agreement of the parties. That supplemental production included additional underlying pleadings, discovery responses, depositions and other materials. H.D. Smith claim this information is immaterial to Cincinnati's obligation to indemnify it for the amount of the underlying settlement, which H.D. Smith says is demonstrated by Cincinnati's decision not to rely on any of the information in support of its summary judgment motion.

Both parties moved for summary judgment. On April 18, 2018, the Court heard oral argument on the motions.

## III.   DISCUSSION

In its summary judgment motion, H.D. Smith claims it settled the underlying

lawsuit in reasonable anticipation of an adverse jury verdict on claims covered by the Cincinnati policy. H.D. Smith alleges the settlement was for an "otherwise covered loss" alleged in the West Virginia lawsuit. Moreover, as a matter of law, the settlement in the underlying lawsuit was reasonable. H.D. Smith contends that Cincinnati has a duty to indemnify H.D. Smith for the entire amount of the settlement. H.D. Smith also seeks the recovery of prejudgment interest on the settlement amount.

In its motion for summary judgment, Cincinnati asserts that it owes no obligation to cover the H.D. Smith settlement because it was not made in reasonable anticipation of liability for covered claims. H.D. Smith cannot establish that it settled an otherwise covered loss in reasonable anticipation of liability. Moreover, H.D. Smith cannot show that the covered claims were a primary focus of the litigation. Cincinnati further asserts it is entitled to summary judgment on H.D. Smith's claim under Section 155 of the Insurance Code. Cincinnati states it complied with Illinois law when it filed this declaratory judgment action. Moreover, there is a bona fide dispute concerning whether Cincinnati must indemnify H.D. Smith for the settlement at issue.

<u>Legal standards</u>

Summary judgment is appropriate if the motion is properly supported

and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The Court construes all inferences in favor of the non-movant. *See Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 925 (7th Cir. 2011). When cross-motions for summary judgment are under consideration, a court construes "all inferences in favor of the party against whom the motion under consideration is made." *Kort v. Diversified Collection Services, Inc.*, 394 F.3d 530, 536 (7th Cir. 2005). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor. *See id*.

The Parties agree that Illinois law governs this case. Under Illinois law, the interpretation or construction of an insurance policy is a question of law and is appropriate for resolution on summary judgment. *See Erie Ins. Exchange v. Imperial Marble Corp.*, 957 N.E.2d 1214, 1219 (3d Dist. 2011). The duty to indemnify under Illinois law is narrower than the duty to defend. *See Selective Ins. Co. of South Carolina v. Target Corp.*, 845 F.3d 263, 269 (7th Cir. 2016). "If an insured settles

an underlying claim before trial, it must show that it settled an otherwise covered loss in reasonable anticipation of liability for the duty to indemnify to apply." *Id*. at 270 (internal quotation marks omitted).

Some courts have held that if "an insured enters into a settlement that disposes of both covered and non-covered claims, the insurer's duty to indemnify encompasses the entire settlement if the covered claims were 'a primary focus of the litigation.'" *Rosalind Franklin University of Medicine and Science v. Lexington Ins. Co.*, 8 N.E. 20, 39 (1st Dist. 2014) (citing *Commonwealth Edison Co. v. National Union Fire Ins. Co.*, 752 N.E.2d 555 (1st Dist. 2001); *Federal Ins. Co. v. Binny & Smith, Inc.* 913 N.E.2d 43 (1st Dist. 2009); *Santa's Best Craft, LLC v. St. Paul Fire & Marine Insurance Co.*, 611 F.3d 339, 352 (7th Cir. 2010)). An insured is not required to allocate between covered and non-covered claims if the insured demonstrates the primary focus of the underlying litigation was a covered loss and it settled in reasonable anticipation of liability. *See Commonwealth Edison Co.*, 752 N.E.2d at 564-65. Reasonableness often depends on the "nature of the pleadings" and "the quality and quantity of proof which [the insured] would expect to be offered against it in an underlying action." *Binny*, 913 N.E.2d at 49; *United States Gypsum Co. v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1244-45 (1st Dist. 1994). In *Binny*, counsel believed that although the plaintiffs' allegations were entirely without merit, there was a risk with proceeding with litigation—including scenarios where

opposing counsel likely would "attempt to sway the jury with emotional arguments" and juror confusion could very well lead to an adverse verdict. *See Binny*, 913 N.E.2d at 49. An insured may have a reasonable anticipation of liability when it faces a jury trial against a sympathetic plaintiff with significant damages, even if the facts against the insured are "weak." *See Cincinnati Ins. Co. v. Blue Cab Co.*, 2015 WL 1538825, at *7 (N.D. Ill. March 31, 2015).

"[R]equiring an insured . . . to establish actual liability in order to receive indemnification would place the insured in the difficult position of having to refute liability in the underlying lawsuit and then, after obtaining a settlement, turn around and prove its own liability in order to succeed in a subsequent insurance coverage action." *Commonwealth Edison*, 752 N.E.2d at 566 (citing *Gypsum*, 643 N.E.2d at 1244). Such a requirement could have a chilling effect on settlements. *See Gypsum*, 643 N.E.2d at 1244.

<u>Reasonable anticipation of liability and covered loss</u>

H.D. Smith notes that it vigorously disputed that it had any actual liability for the claims asserted in the underlying lawsuit and continues to do so. However, it recognized that it faced a potential for significant liability for those claims as a nonresident defendant in front of a jury in an unfavorable jurisdiction.

H.D. Smith further states that although it raised a number of defenses it believed were meritorious, those defenses were rejected by West Virginia courts.

When those defenses were rejected, H.D. Smith had to choose between proceeding to a lengthy and costly trial in an unfavorable jurisdiction or pursuing settlement.

The fact that all but one of H.D. Smith's co-defendants had settled by mid-2016 was another consideration. H.D. Smith reasonably believed that it faced an increased risk of exposure at a trial that was scheduled to begin in January 2017. It had been reported that United States Senator Joe Manchin, a former two-term Governor of West Virginia, planned to testify at trial. It was likely that his testimony would have been damaging to any remaining defendants.

The fact that H.D. Smith settled the case without assurance of any insurance coverage is another consideration which suggests that the decision to settle was reasonable. Presumably, H.D. Smith balanced the prospect of paying a $3.5 million settlement against the possibility of paying a significantly higher amount after a lengthy and costly trial. This factor suggests that the decision to settle was reasonable. Eventually, every defendant who remained in the lawsuit by 2016 settled the claims against them. This also suggests H.D. Smith's decision was made with reasonable anticipation of liability.

Cincinnati contends that the settlement did not involve reasonable anticipation of liability for covered claims. The State of West Virginia sought injunctive relief (Count I), fines and penalties based on statutory violations (Counts II and III), damages for allegedly increased costs for public services related to law enforcement,

health care, court and prosecutorial resources, and jail and prison resources (Count IV) and damages in the form of unjust enrichment (Count VI).[1]  Cincinnati asserts, therefore, that much of the relief sought does not qualify as damages because of "bodily injury" caused by an "occurrence," as is required under the policies.  A court's inquiry involves "whether the claims were *not even potentially covered* by the insurance policy."  *Santa's Best*, 611 F.3d at 352.  When "the parties contest whether the settlement was made in anticipation of covered claims, the burden should be on the insured to prove coverage of the settlement in the first place and then on the insurer to prove the existence of exclusions barring coverage."  *Id*.  The United States Court of Appeals for the Seventh Circuit has already held that the underlying lawsuit involves potentially covered claims.  *See Cincinnati Insurance*, 829 F.3d at 774-75.  This Court then entered partial summary judgment against Cincinnati, holding that Cincinnati had a duty to defend the West Virginia action.  *Id*. at 775.

In its decision, the Seventh Circuit explained how broad the policy language covering suits seeking damages "*because* of bodily injury" is, citing the following example:

> An individual has automobile insurance; the insured individual caused an accident in which another individual became paralyzed sues the insured driver only for the cost of making his house wheelchair accessible, not for his physical injuries.  If the insured driver had a policy that only

covered damages "for bodily injury" it would be reasonable to conclude that the damages sought in the example do not fall within the insurer's duty. However, if the insurance contract provides for damages "because of bodily injury" then the insurer would have a duty to defend and indemnify in this situation.

*Id*. at 774.  "The policy defines 'bodily injury' as 'bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.'"  *Id*. at 773.  Moreover, "'damages because of bodily injury' include 'damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury.'"  *Id*.

The negligence claims asserted in Count V likely would include "damages because of bodily injury."  Similarly Count IV, which seeks damages in the form of increased costs for, *inter alia*, public services relating to law enforcement and  health care might be covered in the same manner that the paralyzed individual who makes his home wheelchair accessible would be.  In any event, the Court has found that covered claims were at issue in the underlying lawsuit and H.D. Smith need not show actual liability.  Moreover, the fact West Virginia never instituted an administrative enforcement action against H.D. Smith and that H.D. Smith was never found in violation  of any state or federal regulations or guidelines concerning the distribution of controlled substances in West Virginia suggests that Counts I and II were not major considerations in the settlement.  Based on the filings in the underlying case,

it appears that H.D. Smith's primary risk of liability was due to the negligence allegations.

The West Virginia court's statement upon denying a motion to dismiss that it was possible after discovery that summary judgment might be appropriate does not affect the reasonableness of the settlement. Courts sometimes use language like that in noting the different legal standards between motions to dismiss and motions for summary judgment. Because the court was not aware of information that would be produced in discovery, it could not accurately predict how a future summary judgment motion would be resolved.

The Court further notes the fact that H.D. Smith raised normal defenses and contested liability throughout the West Virginia litigation is not particularly significant. It is fairly common for defendants to contest liability until the moment of settlement.

Ultimately, the settlement did not include earmarked funds for a "Fight Substance Abuse Fund" or similar entity. The settlement agreement further provided that "[t]he funds paid as a result of this Agreement represent damages alleged to have been sustained by the State of West Virginia and do not represent damages related to federal money or penalties of any kind." This also suggests that the settlement was driven by the negligence claims.

Based on the foregoing, the Court concludes that the settlement was made in reasonable anticipation of liability for covered claims.[2]

Reasonableness of settlement

In determining the reasonableness of a settlement amount, "the test is what a reasonably prudent person in the position of the insured would have settled for on the merits of plaintiff's claim." *Guillen v. Potomac Ins. Co. of Illinois*, 785 N.E.2d 1, 14 (2003). The inquiry "involves a commonsense consideration of the totality of facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial." *Id.* A court may examine settlement amounts of similarly situated entities in comparable cases. *See Pietras v. Sentry Ins. Co.*, 513 F. Supp.2d 983, 987 (N.D. Ill. 2007). The $3.5 million settlement amount for H.D. Smith was higher than those for most of its co-defendants in the underlying litigation. However, given the disparities in the aggregated sales of hydrocodone and oxycodone during the years in question, the difference in the amounts appears to be reasonable. The last remaining co-defendant in the underlying lawsuit settled the claims against it for $16 million. H.D. Smith's settlement amount seems reasonable in comparison.

---

[2] The Court also previously determined that the plaintiffs in the underlying case had sufficiently alleged an "occurrence." Cincinnati did not challenge that ruling on appeal. *See Cincinnati Insurance Co.*, 829 F.3d at 773 n.1.

The settlement also served to relieve Cincinnati of the burden of significant defense costs for trial and a potential appeal. H.D. Smith estimated that a trial would last at least one month. At the time of settlement, H.D. Smith was planning to hire four expert witnesses at significant costs. H.D. Smith estimates that defense costs would have at least approached the $3.5 settlement amount. H.D. Smith discussed these considerations in its letter to Cincinnati dated October 24, 2016.

Based on the foregoing, the Court concludes that the settlement amount in the West Virginia litigation was reasonable.

Covered claims and uncovered claims

Cincinnati alleges H.D. Smith cannot demonstrate that covered claims were a primary focus of the litigation. It claims that Cincinnati's duty to indemnify encompasses the whole settlement only if the covered claims were a "primary focus of the litigation." *Binny*, 913 N.E.2d at 53-54. H.D. Smith alleges Cincinnati has no right to apportion between "covered" and any potentially "uncovered" claims. *See id.* at 54 (finding that the insured was "not required to allocate liability within the settlement" that contained a covered consumer fraud claim and a noncovered warranty claim). The Seventh Circuit has suggested it is not necessary to look to the "primary focus" test unless it is possible that none of the claims involved in the settlement were covered. *See Santa's Best*, 611 F.3d at 352 (the "primary focus" test is useful "in cases in which it is possible that none of the settlement was

attributable to the dismissal of claims for damage covered by the insurer's policy"). "[A]n insured is not required to apportion its *liability* for different claims because that would either require the coverage litigation to be retrial of the merits of the insured's underlying lawsuit [or trial, in case of a settlement] and/or would discourage settlement because the insured would essentially have to prove its own liability for the underlying conduct even if it had not made that concession in arriving at a settlement." *Id*. at 350-51.

The Court has already determined that the settlement agreement included covered claims. This is true whether or not the "primary focus" test is applied. In the second amended complaint, the State of West Virginia alleged that H.D. Smith and other defendants negligently contributed to the "pill mill" scheme by failing to recognize that the volume of prescription medication they distributed to pharmacies exceeded the medical need. It further claimed that H.D. Smith was negligent in failing to recognize from its distribution pattern that West Virginia citizens were obtaining improper prescriptions from physicians and were filling them in West Virginia pharmacies where H.D. Smith distributes its products. West Virginia claimed this alleged negligence in failing to recognize this pattern led, in part, to West Virginia citizens becoming addicted to, and being harmed by, prescription drugs, resulting in bodily injuries to West Virginia citizens. The record shows these negligence claims were the primary focus of the litigation.

The settlement agreement also provided that West Virginia had never instituted any administrative action, complaint or other enforcement against H.D. Smith for statutory or regulatory violations. Prior to 2013, H.D. Smith believed in good faith it was not subject to any requirement to report suspicious orders of controlled substances to the West Virginia Board of Pharmacy. The settlement agreement stated that H.D. Smith did not violate any provision of the West Virginia Uniform Controlled Substances Act, W. Va. Code § 604-3-301 *et seq.*, or any regulations promulgated thereunder, or 21 U.S.C. § 801 *et seq.*, and 21 C.F.R. § 1301.74(b). It provided H.D. Smith has never been found to be in violation of any state or federal regulations or guidelines concerning the distribution of controlled substances in West Virginia. Additionally, the settlement agreement stated that the funds paid by H.D. Smith did not represent any type of penalties. No evidence in the underlying lawsuit suggested that H.D. Smith could have been liable for any claim involving statutory violations or intentional conduct. Rather, the focus of the plaintiff's complaint was on alleged negligence in distributing more pharmaceuticals in West Virginia than were medically necessary.

Accordingly, Cincinnati has a duty to indemnify H.D. Smith for the entire amount of the settlement which plainly resolved potentially covered claims that the Court concludes were the primary focus of the litigation. Moreover, the Court has

no basis to allocate the settlement amount between covered and any allegedly uncovered claims.

### H.D. Smith's claim under Section 155 of the Insurance Code

Cincinnati alleges it is entitled to summary judgment on H.D. Smith's claim under § 155 of the Insurance Code. That section provides that an insured may collect attorney's fees and costs if an insurer creates a "vexatious and unreasonable" delay in settling a claim. H.D. Smith contends numerous factual issues exist which preclude the entry of summary judgment. These include the merits of Cincinnati's substantive position regarding its refusal to pay the settlement, its delay in responding to the settlement negotiations and its forcing of H.D. Smith to use its own funds to pay the settlement.

Section 155 provides "an extracontractual remedy to policyholders," allowing an award "where an insurer has acted vexatiously and unreasonably in refusing to defend its insured." *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122, 1133 (1999). "A court should consider the totality of the circumstances when deciding whether an insurer's conduct is vexatious and unreasonable, including the insurer's attitude, whether the insured was forced to sue to recover, and whether the insured was deprived of the use of his property." *Illinois Founders Ins. Co. v. Williams*, 31 N.E.2d 311, 317 (1st Dist. 2015).

Costs and sanctions under § 155 are inappropriate if there is a bona fide dispute concerning coverage. *See State Farm Mut. Auto. Ins. Co. v. Smith*, 757 N.E.2d 881, 887 (2001). "A *bona fide* dispute is one that is 'real, actual, genuine, and not feigned.'" *Williams*, 31 N.E.2d at 317. An insurer does not act unreasonably or vexatiously under section 155 if the insurer "reasonably relies upon evidence sufficient to form a *bona fide* dispute." *Id*. at 318.

H.D. Smith notes that although it sent Cincinnati multiple notices that settlement negotiations were ongoing and settlement was imminent, Cincinnati failed to provide any response to the settlement for several months. Ultimately, Cincinnati refused to contribute to the settlement and, therefore, H.D. Smith was required to use its own funds to settle the lawsuit.

Upon considering the record and the totality of circumstances, the Court is unable to determine whether Cincinnati acted vexatiously and unreasonably. Cincinnati states that it complied with Illinois law when it filed the instant declaratory judgment action. Although Cincinnati's duty to defend was eventually established, that duty is broader than the duty to indemnify. *See Selective Ins. Co.*, 845 F.3d at 269. H.D. Smith did not take discovery on the issue, did not depose Cincinnati personnel and did not disclose any experts on the issue of Cincinnati's alleged violation of § 155. Moreover, Cincinnati was not involved with H.D. Smith's settlement negotiations with the underlying plaintiff and it claims H.D.

Smith never provided Cincinnati any information supporting the position that any part of the settlement involved damages covered by the policies. H.D. Smith contends that the only information Cincinnati relies upon to dispute its indemnity obligation is information Cincinnati already had in its possession at the time H.D. Smith asked Cincinnati to pay the settlement. Additionally, Cincinnati consistently stated it needed more information to evaluate the settlement but did not rely on the new information to dispute its obligations.

Based on the current record, the Court is unable to determine whether there is a bona fide dispute or whether Cincinnati acted vexatiously and unreasonably in settling the claim. H.D. Smith alleges Cincinnati never responded to its letters regarding settlement while Cincinnati asserts H.D. Smith never provided it with certain information in support of its position on settlement. While there may have been a communication breakdown, there at least are factual disputes relating to what occurred in the weeks and months before H.D. Smith agreed to settle the underlying litigation. These factual disputes preclude the entry of summary judgment on H.D. Smith's claim under § 155.

## IV.    CONCLUSION

For the reasons stated herein, H.D. Smith has established that it settled an otherwise covered loss in reasonable anticipation of liability and that the covered damages were a primary focus of the litigation. The Court will grant H.D. Smith's

motion for partial summary judgment, declaring that Cincinnati has a duty to indemnify H.D. Smith for the full amount of the settlement of the West Virginia action. Cincinnati has breached its insurance policies by failing to indemnify H.D. Smith to date.

"Prejudgment interest may be recovered on written instruments, including insurance policies, calculated from the time the money was due under the policy." *Platinum Technology, Inc. v. Federal Ins. Co.*, 282 F.3d 927, 935 (7th Cir. 2002) (citing 815 ILCS § 205/2). The Court finds that H.D. Smith is entitled to recover prejudgment interest at the statutory rate of 5% per annum from the date of its payment to the date of judgment. 815 ILCS 205/2.

Cincinnati's motion for summary judgment will be denied as to H.D. Smith's counterclaims for declaratory judgment and breach of contract. Because there is a genuine issue of material fact as to H.D. Smith's counterclaim for damages under 215 ILCS 5/155, the Court will also deny that portion of Cincinnati's motion.

Ergo, the motion of Defendant and Counterclaimant H.D. Smith Wholesale Drug Company n/k/a H.D. Smith, L.L.C. for partial summary judgment as to coverage for settlement of the underlying lawsuit [d/e 58] is GRANTED.

The Court declares that Cincinnati Insurance Company has a duty to indemnify H.D. Smith for the full amount of the settlement in the West Virginia

Action and, further, Cincinnati Insurance Company has breached its insurance policies by failing to do so to date.

Pursuant to 815 ILCS 205/2, H.D. Smith is awarded prejudgment interest at the rate of 5% per annum from the date of its payment of the settlement to the date of judgment.

The motion of Plaintiff Cincinnati Insurance Company for summary judgment [d/e 64] is DENIED.

ENTER: September 23, 2019

FOR THE COURT:

/s/ *Richard Mills*
Richard Mills
United States District Judge